# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### LAFAYETTE-OPELOUSAS DIVISION

| | |
|---|---|
| **JAMES TRUETT FIETZ** | **CIVIL ACTION NO. 05-0064** |
| **KYLE W. HALTER** | |
| **AMERICAN PREARRANGED SERVICES, INC.** | |
| | **JUDGE DOHERTY** |
| **VS.** | |
| **SOUTHLAND NATIONAL INS. CO.** | **MAGISTRATE JUDGE METHVIN** |

### *RULING ON MOTIONS IN LIMINE*
### *(Rec. Docs. 56 and 60)*

Before the court are two motions in limine seeking a determination of the applicable law in this case.  In determining the applicable law in this diversity case, the court must apply the conflict of laws analysis of the forum state, i.e., Louisiana.  Louisiana uses an issue-by-issue analysis in deciding what state law is applicable to claims.[1]  Defendant Southland National Insurance Corporation ("Southland") filed a motion arguing that Alabama law should be applied to plaintiffs' claims of detrimental reliance, unjust enrichment, and contract claims, while Texas law should be applied to the defamation claims.[2]  Plaintiffs filed a memorandum requesting that the court apply Louisiana law to all claims.  On January 23, 2007, the district judge referred the motions to the undersigned for disposition.[3]

---

[1] La. Civ. Code Art. 3515.

[2] Rec. Doc. 56.

[3] Rec. Doc. 73.

2

### *Background*

Except where indicated, the facts are not substantially in dispute.  On January 15, 2003, plaintiff Kyle W. Halter telephoned Southland's President, Dennis Painter.[4]  Halter was in Lafayette, Louisiana and Painter was in Tuscaloosa, Alabama.  Halter advised Painter that he and plaintiff James Truett Fietz were leaving their employment with Mission Life Insurance Company and asked whether Southland was interested in working with them in selling insurance policies to funeral homes.  Painter invited Halter to come to Southland's office in Tuscaloosa to discuss the matter further.[5]

On January 29, 2003, Halter traveled from his home in Louisiana to Tuscaloosa and met with Painter for several hours to discuss a possible partnership between Southland, Halter, and Fietz.[6]  Plaintiffs contend that during the meeting, Painter offered to provide Halter and Fietz with override commissions on all agents they brought to Southland for as long as the agents wrote Southland policies, regardless of whether Halter and Fietz were still with Southland.[7]  Painter told Halter that he would call him at a later date because he needed to discuss the "numbers" with the board.[8]

According to Halter, Painter telephoned him to say that the board was excited about partnering with Halter and Fietz as they had discussed.[9]  Painter allegedly stated that the

---

[4] Halter is domiciled in Louisiana, Fietz is in Texas, and Southland is in Alabama.

[5] Exhibit 1(Deposition of Halter) to Rec. Doc. 60 at p. 81.

[6] Id.

[7] Id. at pps. 71, 78-79.

[8] Id. at p. 71-72.

[9] Id. at p. 108.

3

percentage of override commissions would be less than what they had originally discussed. Halter, who claims to have been Fietz's agent with authority to accept the deal for Fietz, allegedly replied "We'll accept that."[10]

On February 10, 2003, Halter, Fietz and two other employees of Mission who wanted to become Southland employees, flew to Tuscaloosa to meet with Painter and the Southland employees.[11]  During the meeting, the details of the partnership allegedly were discussed.[12]  In his deposition, Fietz testified that the meeting lasted all day and that "Mr. Painter was very adamant about getting us onboard.  We were still up in the air a little bit about what we were going to do... And so he was laying out, so to speak – or kind of closing the sale, closing the deal: 'This is why you guys need to come onboard with us.'"[13]

On March 20, 2003, Painter sent commission contracts to Halter and Fietz.  The three men later had a conference call during which they allegedly discussed the fact that the draft contracts failed to include any reference to Southland's agreement to pay commissions to Halter and Fietz for Southland policies written by agents brought onboard by Halter and Fietz.[14] Plaintiffs contend that Painter explained that the commission contracts were simply the standard contracts executed by Southland personnel, and it was agreed that the contracts would not cover

---

[10] Id. at p. 109.

[11] Id.

[12] Id. at p. 111.

[13] Exhibit 2 (Deposition of Fietz) to Rec. Doc. 60 at p. 57-59.

[14] Id. at pp. 114-115, 123.

4

their separate agreement concerning the override commissions.  Halter and Fietz completed the paperwork and returned it to Southland.

Halter and Fietz began working with Southland in March, 2003.  Halter worked out of an office in Lafayette, Louisiana, which he leased on December 17, 2003.[15]  Southland paid a portion of the salary of Halter's secretary.[16]  Fietz worked out of his home in Texas.  Their goal was to bring in agents for Southland in the western division.  Halter brought in agents from Louisiana, Mississippi, Texas, Oklahoma, Florida, and Tennessee.[17]  Fietz brought in agents from Texas and New Mexico.[18]

Painter left Southland in May, 2004.  Thereafter, Southland sent termination letters to Halter and Fietz advising that their commission contracts would terminate on July 1, 2004.  Subsequently, Halter and Fietz formed plaintiff company American Prearranged Services, Inc. ("APSI"), which directly competes with Southland.

On December 7, 2004, plaintiffs filed suit in the 15th Judicial District Court, Lafayette Parish, Louisiana.[19]  Plaintiffs claim they are entitled to damages for detrimental reliance, unjust enrichment, breach of contract, and defamation.  The defamation claim is based upon allegations that employees of Southland made disparaging remarks about them to agents and businesses in an attempt to limit their ability to compete with Southland.

---

[15] Exhibit A to Rec. Doc. 56.

[16] Exhibit 4 (Deposition of Painter) to Rec. Doc. 60 at p. 55.

[17] Id. at pps. 120-121.

[18] Exhibit 2 (Deposition of Fietz) to Rec. Doc. 60 at p. 162.

[19] Rec. Doc. 1.

5

On January 13, 2005, Southland removed the case to this court based on diversity

jurisdiction.

### Issue Presented

The sole issue presented is what state law applies to the various issues in the case –

Alabama, Louisiana, and/or Texas.

### Legal Analysis

**1.    General Precepts - Conflict of Laws**

"If the laws of the states do not conflict, then no choice-of-law analysis is necessary."

Schneider National Transport v. Ford Motor Company, 280 F.3d 532, 536 (5th Cir 2002) *quoting*

W.R. Grace & Company v. Continental Casualty Company, 896 F.2d 865, 874 (5th Cir.1990);

National Union Fire Insurance v. CNA Insurance Companies, 28 F.3d 29, 32 n. 3 (5th Cir.1994)).

When the laws of the states do not conflict, the law of the forum state applies.  Id.

When the laws do conflict, a federal court sitting in diversity applies a conflict of laws

analysis in accordance with the law of the forum state.  Klaxon Co. v. Stentor Electric Mfg. Co.,

313 U.S. 487, 61 S.Ct. 1020 (1941); Roberts v. Energy Development Corp., 104 F.3d 782, 786

(5th Cir1997).  Louisiana uses an issue-by-issue analysis in deciding what state law is applicable.

The general conflict of laws provision is found in La. Civ.Code Art. 3515:

> **Art. 3515. Determination of the applicable law; general and residual rule**
>
> Except as otherwise provided in this Book, an issue in a case having contacts with
> other states is governed by the law of the state whose policies would be most
> seriously impaired if its law were not applied to that issue.
>
> That state is determined by evaluating the strength and pertinence of the relevant
> policies of all involved states in the light of: (1) the relationship of each state to
> the parties and the dispute; and (2) the policies and needs of the interstate and
> international systems, including the policies of upholding the justified

6

expectations of parties and of minimizing the adverse consequences that might
follow from subjecting a party to the law of more than one state.

Comment (a) points out that Article 3515 provides the general rule when another more specific

rule is inapplicable:

> (a) *The residual and general nature of this Article.*  This Article applies only to
> cases that fall within the scope of this Book and that are not "otherwise provided
> [for] in this Book". Thus, this is the residual article. If any other article in this
> Book is found to be applicable to a particular case or issue, that article prevails.
> However, Article 3515 also serves as the general article, in the sense that it
> contains the general principles from which the other articles of this Book have
> been derived and in light of which they should be applied.

Comment (d) to Article 3515 explains that because of the issue-by-issue analysis, "laws

of different states may be applied to different issues in the same dispute."

Issues regarding contractual and quasi-contractual[20] disputes are governed by

La. Civ. Code Art. 3537, which restates the general rule, but adds specific criteria for

determining which state's policies would be most seriously impaired if its law were not applied

to the issue:

**Art. 3537. General rule**

Except as otherwise provided in this Title, an issue of conventional obligations is
governed by the law of the state whose policies would be most seriously impaired
if its law were not applied to that issue.

That state is determined by evaluating the strength and pertinence of the relevant
policies of the involved states in the light of: (1) the pertinent contacts of each
state to the parties and the transaction, including the place of negotiation,
formation, and performance of the contract, the location of the object of the
contract, and the place of domicile, habitual residence, or business of the parties;
(2) the nature, type, and purpose of the contract; and (3) the policies referred to in
Article 3515, as well as the policies of facilitating the orderly planning of

---

[20] *See* La. Civ. Code Art. 3541 (quasi-contractual obligations are governed by Articles 3537-3541).

transactions, of promoting multistate commercial intercourse, and of protecting one party from undue imposition by the other.

The specific article on tort issues likewise provides specific standards for analysis:

## Art. 3542. General rule

Except as otherwise provided in this Title, an issue of delictual or quasi-delictual obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.

That state is determined by evaluating the strength and pertinence of the relevant policies of the involved states in the light of: (1) the pertinent contacts of each state to the parties and the events giving rise to the dispute, including the place of conduct and injury, the domicile, habitual residence, or place of business of the parties, and the state in which the relationship, if any, between the parties was centered; and (2) the policies referred to in Article 3515, as well as the policies of deterring wrongful conduct and of repairing the consequences of injurious acts.

In order to determine whether an issue sounds in contract or tort, the court must look to "the nature of the duty breached." Roger v. Dufrene,  613 So.2d 947, 948 (La. 1993) *citing* Sciacca v. Polizzi, 403 So.2d 728, 730 (La.1981) *quoting* Kozan v. Comstock, 270 F.2d 839, 844 (5th Cir.1959).  The distinction between "damages ex contractu" and "damages ex delicto" is that damages ex contractu arise out of the breach of a special obligation contractually assumed by the obligor, whereas the damages ex delicto flow from the violation of a general duty owed to all persons.  Harrison v. Gore, 660 So.2d 563, 568 (La.App. 2 Cir. 1995) *citing* Davis v. LeBlanc, 149 So.2d 252 (La.App. 3d Cir.1963).   The term "ex delicto" is used in law to indicate the consequences of a tort.  Scott v. American Tobacco Co., Inc., 2007 WL 495259, *21  (La.App. 4 Cir. 2007).

8

Plaintiffs allege four claims (detrimental reliance, contract claims, unjust enrichment, and defamation), which must be addressed separately in order to determine which state's law applies.[21]

## 2.   **Detrimental Reliance**

Plaintiffs contend that their detrimental reliance claims sound in tort, and that Louisiana law applies apply under La. Civ. Code Art. 3543.[22]  Defendant contends that the claims sound in quasi-contract, and that Alabama law applies under La. Civ. Code Art. 3537.[23]

Plaintiffs rely upon Breaux v. Schlumberger to support their argument that a detrimental reliance claim sounds in tort.  817 F.2d 1226, 1231 (5th Cir. 1987).  In Breaux, the plaintiff sued after defendant reneged on an agreement to lease plaintiff's office space.  The court discussed whether La. Civ. Code Art. 1967, which codified the claim of detrimental reliance, was to be applied retroactively since the complaint was filed before the enactment of the article.  The court

---

[21] Although plaintiff argues that there is a "false conflict" because only Louisiana has an interest in the application of its law to this case, it is clear, as discussed *infra*, that Alabama and Texas also have interest in the law applicable, and therefore, plaintiff's argument is without merit. [A false conflict "occurs when it is found that only a single state has an interest in the application of its law, and that the other state has no interest in the application of its law in the case." Jagers v. Royal Indemnity Co., 276 So.2d 309, 311 (La.1973).]

[22] **Art. 3543. Issues of conduct and safety**

> Issues pertaining to standards of conduct and safety are governed by the law of the state in which the conduct that caused the injury occurred, if the injury occurred in that state or in another state whose law did not provide for a higher standard of conduct.

> In all other cases, those issues are governed by the law of the state in which the injury occurred, provided that the person whose conduct caused the injury should have foreseen its occurrence in that state.

> The preceding paragraph does not apply to cases in which the conduct that caused the injury occurred in this state and was caused by a person who was domiciled in, or had another significant connection with, this state. These cases are governed by the law of this state.

[23] The text of the Article is set out at pp. 6-7 *supra*.

9

noted that "it is not necessary to determine whether Article 1967 is retroactive since Louisiana courts have recognized a cause of action for detrimental reliance under [tort] Article 2315." Id. at 1229.

Subsequent to Breaux, however, the Fifth Circuit concluded that detrimental reliance is a contractual claim.  In Stokes v. Georgia-Pacific Corp., 894 F.2d 764, 770 (5th Cir. 1990), the plaintiff sued the defendant based on defendant's representation that it would purchase wood chips from plaintiff for an extended period.  The court rejected defendant's contention that detrimental reliance sounds in tort:

> We are unconvinced by Georgia-Pacific's lackluster contention that Stokes' claim in detrimental reliance sounds in tort and thus prescribed before he filed suit. Indeed, in its reply brief responding to Stokes' cross-appeal, Georgia-Pacific makes a forceful argument that an action in detrimental reliance sounds in contract. La.Civ.Code art. 1967 was enacted in the 1984 revision of the Obligations section of the Civil Code. It appears in Book III, Title IV, entitled "Conventional Obligations or Contracts." Furthermore, the eminent scholar who directed the drafting of the new articles expressly places detrimental reliance in the contract realm. Litvinoff, Still Another Look at Cause, 48 La.L.Rev. 3, 27-28 (1987).

See also Roxco Ltd. v. Harris Specialty Chemical, Inc.,  85 Fed.Appx. 375, 378, 2004 WL 48913, 2 (5th Cir. 2004) (unreported) (noting that a claim for detrimental reliance is based on promissory estoppel, not tort).

The issue gained new complexity in 2002.  In Copeland v. Wasserstein, Perella & Co., Inc., 278 F.3d 472 (5th Cir. 2002), plaintiff sued his financial advisors for breach of fiduciary duties and detrimental reliance on assurances regarding a merger plan.  The court held that detrimental reliance might sound in tort or in contract, based upon the nature of the duty allegedly breached:

10

> We acknowledge that in <u>Stokes v. Georgia Pacific Corp.</u>, we stated that an action
> based on a detrimental-reliance theory sounds in contract. Stokes was a classic
> detrimental-reliance case, however, in which a supplier made substantial
> investments relying on a customer's assurances of future purchases. Jurisprudence
> of the Supreme Court of Louisiana on prescription binds us in diversity, and that
> court reasoned in <u>Roger v. Dufrene</u> [613 So.2d 947 (La. 1993)] that "[i]t is the
> nature of the duty breached that should determine whether the action is in tort or
> in contract." Therefore, although *non* feasance in the performance of an obligation
> creates a cause of action that prescribes in ten years, *mis* feasance in the
> performance of a contract for professional services, such as those provided by a
> lawyer, doctor, accountant, or insurance agent, gives rise to a claim in tort, which
> prescribes in one year.

<u>Id</u>. at 479.  Because the plaintiff in <u>Copeland</u> alleged that defendants' advice fell short of the

standard of care for financial advisors, the court concluded that plaintiff's claim was a tort claim.

Here, plaintiffs' detrimental reliance claim arises from representations that Painter

allegedly made about partnering with Halter and Fietz, particularly that Southland would pay

override commissions to Halter and Fietz for as long as the agents they brought to Southland

continued to write policies for the company.[24]  Although the petition characterizes the

detrimental reliance claim as a tort claim, it is not the label that determines whether a cause of

action is a tort or contract claim, but, under <u>Copeland</u>, the nature of the breach.  <u>Id</u>. at 479.

Plaintiffs allege that defendant breached a duty that was owed to them specifically, not a general

duty owed to the public.  *See* <u>Harrison v. Gore</u>, *supra*, 660 So.2d at 568.  Moreover, the claim is

not for misfeasance but rather for nonfeasance because defendant has not paid the commissions

and expenses allegedly owed.

In accordance with the foregoing analysis, the undersigned concludes that plaintiffs'

detrimental reliance claims sound in contract.  Louisiana Civ. Code Art. 1967, which codifies

---

[24] Rec. Doc. 71 at p. 21.

11

detrimental reliance, was placed in the "Conventional Obligations or Contracts" section of the civil code.  Considering this, combined with the fact that plaintiffs' claims arise from an allegation that defendant failed to perform an obligation that it owed to plaintiffs specifically, and which arises in the context of an agreement concerning partnership and business dealings, the undersigned concludes that plaintiffs' detrimental reliance claims sound in contract for the purposes of determining the law to be applied.  Accordingly, La. Civ. Code Art. 3537 applies.[25]

### State law and policies

The Louisiana doctrine of detrimental reliance is "designed to prevent injustice by barring a party from taking a position contrary to his prior acts, admissions, representations, or silence." Babkow v. Morris Bart, P.L.C., 1998-0256 (La.App. 4 Cir. 12/16/98), 726 So.2d 423, 427 *quoting* Orr v. Bancroft Bag, Inc., 29,046 (La.App. 2 Cir. (1/22/97), 687 So.2d 1068, 1070). Louisiana Civil Code Article 1967 sets forth the elements of the claim:

> A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying.  Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee's reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable.

To prevail on a detrimental reliance claim, Louisiana law does not require proof of a formal, valid, and enforceable contract.  Babkow, 726 So.2d at 429 *citing* Morris v. People's Bank & Trust Co., 580 So.2d 1029 (La.App. 3 Cir.), *writ denied*, 588 So.2d 102 (La. 1991). Likewise, the existence of a contract does not necessarily preclude a detrimental reliance claim.

---

[25] *See* pp. 6-7 *supra*.

12

*See* JCM Const. Co., Inc. v. Orleans Parish School Bd, 2002-0824 (La. App. 4 Cir. 11/17/03) 860 So. 2d 610 (parties had contract and plaintiff recovered damages on detrimental reliance claim).

Alabama recognizes promissory estoppel, which is similar to detrimental reliance, and which is based "upon the ground of public policy and good faith, and is interposed to prevent injustice and to guard against fraud by denying to a person the right to repudiate his acts, admissions, or representations, when they have been relied on by persons to whom they were directed and whose conduct they were intended to and did influence." Mazer v. Jackson Ins. Agency, 340 So.2d 770, 772 (Ala. 1976) (discussing equitable estoppel and noting that the elements of equitable and promissory estoppel are the same).  In Mazer, the court explained that, "The purpose of equitable estoppel and promissory estoppel is to promote equity and justice in an individual case by preventing a party from asserting rights under a general technical rule of law when his own conduct renders the assertion of such rights contrary to equity and good conscience."  Id., *citing* First National Bank of Opp v. Boles, 231 Ala. 473, 479, 165 So. 586, 592 (1936).

Likewise, Texas recognizes promissory estoppel.  "Promissory estoppel operates to enforce an otherwise unenforceable promise; '[i]t cannot replace an enforceable contract.'" Superior Laminate & Supply, Inc. v. Formica Corp.,  93 S.W.3d 445, 449 (Tex.App.-Houston [14 Dist.] 2002); Vogel v. Travelers Indem. Co., 966 S.W.2d 748, 754 (Tex.App.-San Antonio 1998, no pet.). [26]

---

[26] "For many years, Texas courts have held that promissory estoppel becomes available to a claimant only in the absence of a valid and enforceable contract."  Doctors Hosp. 1997, L.P. v. Sambuca Houston, L.P.,  154 S.W.3d 634, *636 -637 (Tex.App.-Houston [14 Dist.],2004).  String citation omitted.

13

Thus, Louisiana, Alabama, and Texas all recognize the claim for detrimental reliance or promissory estoppel.  Although the purposes for the claims are similar, i.e., to prevent the injustice of allowing someone to act contrary to promises or representations he has made if another has relied on those promises, they conflict regarding the implication of an express contract.

### Article 3537 factors

The first two factors of Article 3537 require the evaluation of "the pertinent contacts of each state to the parties and the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties" and "the nature, type, and purpose of the contract." Comment (f) to Article 3537 explains that the nature, type, or purpose of the contract may provide useful in "assessing the relative importance of factual contacts and the relative pertinence of multistate considerations."[27]

---

[27] Article 3537 also requires consideration of the factors set forth in Article 3515, i.e., "the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state." Comment (c) to Article 3515 explains that this consideration includes discouraging forum shopping, as well as other policies such as:

> All other factors being equal, the parties should not be subjected to the law of a state that they had no reason to anticipate would be applied to their case."In some instances, however, the parties may have had, or should have had, reason to anticipate the application of the law of a certain state, but they may have had no way of complying with that law. For example, a corporation may have reason to anticipate that the laws of states in which it does business may be applicable to some aspects of its internal organization, but that corporation might have no way of complying with the law of all of those states, short of reincorporating in each such state. See Order of Commercial Travelers v. Wolfe, 331 U.S. 586 (1947). Similarly, the parties to an ordinary juridical act intended to be performed in more than one state may find it difficult to comply with the requirements of each state. Even complying with the most stringent of these laws may sometimes be problematic if what is required by that law is outlawed by the law of another state. In these and similar instances, the court should try to "minimiz[e] the adverse consequences that might follow from subjecting a party to the law of more than one state."

There is no evidence that plaintiffs have forum shopped or that the policy consideration involved in

14

With respect to state contacts, Halter is domiciled in Louisiana, Fietz is domiciled in Texas, and Southland is located in Alabama. The first relevant contact between the parties was when Halter (in Lafayette, La.) called Painter at Southland's office in Tuscaloosa. The partnership negotiations took place in Alabama, when Halter traveled from Louisiana to Tuscaloosa to discuss a business arrangement between Halter, Fietz, and Southland. The negotiations were not complete during this meeting, however, because at the conclusion of the meeting, Painter advised Halter that he needed to discuss the matter with Southland's board. Subsequently, Painter (in Alabama) called Halter (in Louisiana), and Halter agreed to the alleged offer made by Painter regarding Halter and Fietz working with Southland and receiving override commissions.[28] Thereafter, Halter and Fietz flew to Alabama and met with Painter for a day-long meeting regarding the alleged partnership, during which Fietz claims Painter tried to close the deal.

Thus, the negotiations primarily took place in Alabama, with Louisiana's only contact being that Halter participated in two phone calls while in Louisiana. The parties did not meet in Louisiana, but rather the primary negotiations took place when Halter met Painter in Alabama.

Once Halter and Fietz were working with Southland, they brought in agents from Louisiana, Mississippi, Texas, Oklahoma, Florida, Tennessee, and New Mexico. Plaintiffs allege that Southland had agreed to pay override commissions to Halter or Fietz on any Southland policies sold by agents brought in by Halter or Fietz. The performance of the agreement – i.e. the

---

minimizing the consequences of subjecting a party to the law of more than one state are present in this case. Further, the other policy considerations of Article 3537 (policies of facilitating the orderly planning of transactions, of promoting multistate commercial intercourse, and of protecting one party from undue imposition by the other) are not applicable to this case.

[28] Exhibit 1 to Rec. Doc. 60 at p. 109.

sale of Southland policies and the payment of the commissions thereon – encompassed several states, including Louisiana and Alabama.

Considering the foregoing, the undersigned concludes that Alabama had the most pertinent contacts with the parties and the alleged partnership deal.  Alabama was the center of the parties' negotiations, as well as the headquarters of the company which was to pay plaintiffs and employ their agents for whom they were to draw an override commission.  Further, Painter did not visit Louisiana, thus any alleged representation he would have made to plaintiffs would have been made while he was in Alabama.  Accordingly, the undersigned concludes that Alabama law is applicable to the detrimental reliance claim.

**3.**     **Unjust Enrichment**

Plaintiffs argue that if their detrimental reliance claims are not successful, then they are entitled to damages for unjust enrichment.  Plaintiffs maintain that Louisiana law should apply to these claims, while Southland argues that Alabama law is applicable.

### *State law and policies*

Louisiana, Alabama, and Texas all recognize a claim for unjust enrichment.  In Louisiana, "[t]here is a general concept of quasi contractual obligations; it is a concept based upon the principle that where there is an unjust enrichment of one at the expense or impoverishment of another, then the value of that enrichment or else, in some cases, the amount of the impoverishment, must be restituted."  Minyard v. Curtis Products, Inc., 251 La. 624, 205 So.2d 422 (1967) *citing* Planiol, Traite Elementaire De Droit Civil, T. 2, n0 812, n0 813 (8th ed. 1939). *see also* Munro v. Carstensen,   41,714 (La.App. 2 Cir. 2006), 945 So.2d 961, 966 ("The root principle of unjust enrichment is that the plaintiff suffers an economic detriment for which he

16

should not be responsible, while the defendant receives an economic benefit for which he has not

paid.") The requirements of an unjust enrichment claim are: 1) there must be an enrichment, 2)

there must be an impoverishment, 3) there must be a connection between the enrichment and

resulting impoverishment, 4) there must be an absence of "justification" or "cause" for the

enrichment and impoverishment, and 5) there must be no other remedy at law available to

plaintiff. Baker v. Maclay Properties Co., 94-1529 (La.1/17/95), 648 So.2d 888, 897. The claim

of unjust enrichment is available when the law does not provide another remedy, i.e., there is no

express contract between the parties. See La. Civ. Code Art. 2298; Pinnacle Operating Co., Inc.

v. Ettco Enterprises, Inc., 40,367 (La. App. 2 Cir. 2005) 914 So.2d 1144, 1150.

Under Alabama law, "[t]he essence of the theor[y] of unjust enrichment ... is that facts

can be proved which show that defendant holds money which in equity and good conscience

belongs to plaintiff or was improperly paid to the defendant because of mistake or fraud." Davis

v. Sterne, Agee and Leach, Inc., 2007 WL 80810, *14 (Ala. 2007) quoting Foshee v. General

Tel. Co. of Southeast, 295 Ala. 70, 72, 322 So.2d 715, 717 (1975). "To obtain restitution, the

plaintiffs were required to show that the defendants were unjustly enriched, that the defendants

secured a benefit, and that it would be unconscionable to allow them to retain that benefit."

Scrushy v. Tucker, 2006 WL 2458818, *10(Ala. 2006) citing Fleer Corp. v. Topps Chewing

Gum, Inc., 539 A.2d 1060, 1062 (Del. 1988). The claim of unjust enrichment is generally not

available when the parties have an express contract. Kennedy v. Polar-Bek & Baker Wildwood

Partnership, 682 So. 2d 443 (Ala. 1996).

Likewise, a claim for unjust enrichment in Texas is an equitable remedy for someone who

has conferred benefits upon another who has unjustly received those benefits. Heldenfels Bros.,

Inc. v. City of Corpus Christi, 832 S.W.2d 39 (Tex. 1992).  The Texas doctrine of unjust

enrichment is also premised on restitution, with the purpose being to place "an aggrieved plaintiff

in the position he occupied prior to his dealings with the defendant." Burlington N. R.R. v.

Southwestern Elec. Power Co., 925 S.W.2d 92, 97 (Tex.App.-Texarkana 1996), aff'd, 966

S.W.2d 467 (Tex.1998).  Further, in general, a claim for unjust enrichment is precluded when a

valid express contract exists between the parties.  Fortune Prod. Co. v. Conoco, Inc., 52 S.W.3d

671, 684 (Tex. 2000).

Thus, the requirements of an unjust enrichment claim are the essentially the same in each

of the three states.  The plaintiffs must prove that the defendant was unjustly enriched at

plaintiffs' expense and that plaintiffs should receive restitution for that enrichment.  Moreover,

an express contract is not required in any of the states at issue.

Because the laws of Louisiana, Alabama, and Texas do not conflict regarding unjust

enrichment claims, the undersigned concludes that the law of Louisiana, i.e., the forum state,

should apply.  See Schneider National Transport v. Ford Motor Company, supra, 280 F.3d at 536

("If the laws of the states do not conflict, then no choice-of-law analysis is necessary.")

**4.      Contract Claims**

Plaintiffs argue that, although not in written form, they formed a partnership, or

alternatively "an agreement to have some business arrangement, referred to as 'partnering,'"[29]

with Southland, and plaintiffs are entitled to damages for the way Southland terminated the

partnership and for other breaches of the partnering contract.[30]  Plaintiffs argue that Louisiana

---

[29] Rec. Doc. 60 at p. 23.

[30] Rec. Doc. 60 at p. 26.

18

law is applicable to these contract claims.  Southland maintains that Alabama law should apply,

or alternatively Louisiana law should apply to Halter's claims and Texas law to Fietz's.

### State law and policies

Louisiana allows parties to enter into an oral contract, and the oral contract (when its

value exceeds $500.00) will be enforced when a party can prove the existence of the contract

with "at least one witness and other corroborating circumstances."   La. Civ. Code Art. 1846.

The plaintiff may serve as the witness to establish the existence of an oral contract.  Smith v.

Dishman & Bennett Speciality Co., 35,682 (La.App.2d Cir.1/23/02), 805 So.2d 1220.  The other

corroborating circumstances need only be general in nature, however, that evidence must come

from a source other than the plaintiff.  Suire v. Lafayette City-Parish Consol. Gov't, 04-1459,

1460, 1466 (La.4/12/05), 907 So.2d 37.

Alabama has enacted a statute of frauds, which prohibits the enforcement of oral

contracts with a duration of more than one year.  Ala. Code 1975 § 8-9-2.   The Alabama

Supreme Court explained the reason for the adoption of the statute of frauds:

> In 1823, Alabama adopted the English Statute of Frauds, 29 Car. II, ch. 3 (1676),
> enacted by Parliament and approved by King Charles II, effective June 24, 1677.
> Toulmin Code 1823, Tit. 18, Ch. III, § 1. Section 1, 29 Car. II, ch. 3 (1676), states
> the purpose of the Statute of Frauds, in pertinent part: "For prevention of many
> fraudulent Practices, which are commonly endeavored to be upheld by Perjury and
> Subordination [sic] of Perjury." Further, "[t]he public policy underlying the statute
> of frauds is that fraud or perjury will not be rewarded by denying enforcement of
> alleged contracts that never, in fact, existed. The statute exists to protect not just
> the parties to a contract, but also to protect the fact finder from charlatans,
> perjurers and the problems of proof accompanying oral contracts." 73 Am.Jur.2d
> Statute of Frauds § 425, p. 102 (2001) (footnotes omitted) (emphasis added). See
> David Co. v. Jim W. Miller Constr., Inc., 444 N.W.2d 836 (Minn.1989), and
> McInerney v. Charter Golf, Inc., 176 Ill.2d 482, 223 Ill.Dec. 911, 680 N.E.2d
> 1347 (1997). Moreover, "[t]he purpose of the statute of frauds is to prevent the
> fraudulent enforcement of unmade contracts, and not to legitimate [sic] the
> enforcement of contracts that were in fact made." 73 Am.Jur.2d Statute of Frauds

§ 425, p. 103 (2001) (footnote omitted). See <u>Timberlake v. Heflin</u>, 180 W.Va. 644, 379 S.E.2d 149 (1989).

Thus, the Statute of Frauds identifies defined categories of oral promises that are especially subject to fabrication and especially unworthy of reliance or enforcement.

<u>Bruce v. Cole</u>,  854 So.2d 47, 58 (Ala.. 2003).

Texas has also adopted the statute of frauds, precluding the enforcement of oral contracts that extend beyond one year.  V.T.C.A., Bus. & C. § 26.01(b)(6).

Thus, Louisiana allows for oral contracts of a duration for more than one year when the existence of the contract is proven by the testimony of one witness (which can be the plaintiff) and other corroborating evidence.  In contrast, Alabama and Texas preclude oral contracts of an extended duration in order to prevent the fraudulent enforcement of contracts that were not in fact entered into by the parties.

### *Article 3537 factors*

As set forth above, the negotiations surrounding the partnering agreement took place primarily in Alabama.  Halter initiated the discussion by calling Painter at Southland's office in Tuscaloosa.  Halter then went to Alabama to discuss the matter further.  Although Painter later called Halter in Louisiana, Halter and Fietz went to Alabama and had a day-long meeting with Painter in which Painter tried to convince the men that they should work with Southland.

Halter and Fietz later signed Commission Contracts with Southland, but those contracts do not include the partnering agreement, because that alleged agreement was separate from their general employment/work with Southland.  Nonetheless, those contracts originated in Alabama, were signed in Louisiana by Halter and Texas by Fietz, and returned to Alabama.

20

Thereafter, Halter and Fietz began working with Southland and recruited agents throughout the south for Southland.  Although Halter claims that he directed the recruitment efforts from his office in Lafayette, the actual performance of the alleged partnering agreement, i.e., to have agents selling Southland's policies, occurred in the several states in which Halter and Fietz had recruited the agents.  Since the contract was not performed by Halter and Fietz in primarily one state, this factor does not weigh in favor of any particular state.

Southland's payment of Halter's and Fietz's commissions, however, came from Southland's office in Alabama.  Thus, Southland's performance of the obligation was made in Alabama.

Considering the substantial contacts Alabama had with the partnering agreement, and Alabama's strong public policy discouraging oral contracts, the undersigned concludes that Alabama law should apply to plaintiffs' contract claims.

## 5.     **Defamation**

Plaintiffs maintain that Southland made disparaging remarks about Fietz to funeral home directors in Texas.  The allegedly defamatory statements included remarks that Fietz "sold policies that were no good," that he had "cost Southland Corporation too much money," and that Fietz misrepresented the quality of the insurance companies.[31]  Plaintiffs argue that Fietz's defamation claims should be governed by Texas law because that is where the conduct and injury occurred.  Plaintiffs maintain that the defamatory statements about Fietz were made in order to unfairly compete with Halter and APSI.  Additionally, plaintiffs argue that disparaging remarks

---

[31] Exhibits 10 (Affidavit of Richard Dowell), 11 (Affidavit of Jackie Harkey), and 12 (Robert Moore), Rec. Doc. 60.

21

were made about Halter.[32]  Plaintiffs argue that Halter and APSI's defamation claims should be governed by Louisiana law because that is where their injuries occurred.  Defendant maintains that Texas law should apply to all of the plaintiffs' defamation claims.

It is undisputed that plaintiffs' defamation claims are tort claims.  Louisiana Civil Code Article 3542[33] provides the general rule regarding conflict of law analysis for tort claims, however, Comment (b) to Article 3542 directs that the rules contained in Articles 3543 through 3546 are more specific, and where applicable, prevail over Article 3542.  The specific torts outlined in Articles 3543 through 3546 are: issues of conduct and safety (Article 3543), issues of loss distribution and financial protection (Article 3544), products liability (Article 3545), and punitive damages (Article 3546).  Clearly, this is not a claim of products liability or one requesting punitive damages.  Additionally, Comment (a) to Article 3543 states, "[b]y way of illustration, so-called 'rules of the road' establish or pertain to 'standards of conduct and safety,' whereas rules that impose a ceiling on the amount of compensatory damages or provide immunity from suit are 'rules of loss distribution and financial protection.' " Comment (a) also explains that issues pertaining to standards of conduct and safety are those that deal with "[a] state's policy of deterrence embodied in its conduct-regulating that occurs within its territory,

---

[32] Rec. Doc. 60 at p. 37, citing Exhibit 1(Deposition of Halter) at p. 205.

[33] Article 3542 states:
     Except as otherwise provided in this Title, an issue of delictual or quasi-delictual obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
     That state is determined by evaluating the strength and pertinence of the relevant policies of the involved states in the light of: (1) the pertinent contacts of each state to the parties and the events giving rise to the dispute, including the place of conduct and injury, the domicile, habitual residence, or place of business of the parties, and the state in which the relationship, if any, between the parties was centered; and (2) the policies referred to in Article 3515, as well as the policies of deterring wrongful conduct and of repairing the consequences of injurious acts.

22

even if the parties involved are not domiciled in that state." Here, the undersigned concludes that

laws regarding defamation relate to deterring injurious conduct.

Louisiana Civil Code Art. 3543 states:

Issues pertaining to standards of conduct and safety are governed by the law of the state in which the conduct that caused the injury occurred, if the injury occurred in that state or in another state whose law did not provide for a higher standard of conduct.

In all other cases, those issues are governed by the law of the state in which the injury occurred, provided that the person whose conduct caused the injury should have foreseen its occurrence in that state...

Here, plaintiffs' allege that the defamatory conduct occurred in Texas, but that the injury

was in Louisiana. As set forth below, neither Louisiana nor Texas have a higher standard of

conduct regarding defamation. Thus, applying the first paragraph of Article 3543, the

undersigned concludes that the plaintiffs' defamation claims are governed by Texas because that

is where the defamatory conduct occurred.[34]

### *Standards of conduct in Louisiana and Texas*

In order to determine which state's law is applicable to plaintiffs' defamation claims, the

court must review the defamation laws of the states at issue to determine whether either state has

a higher standard of conduct. If one state has a higher standard of conduct, that state's laws are

applicable. If neither state has a higher standard of conduct, the law applied will be that of the

state where the conduct occurred.

---

[34] The undersigned notes that the result would be the same under Article 3542, i.e., the general rule regarding conflict of laws involving tort issues. Considering that the conduct and some of the injuries occurred in Texas, the undersigned concludes that Texas law should apply.

23

Louisiana defines defamation as "a tort involving the invasion of a person's interest in his or her reputation and good name."  Kennedy v. Sheriff of East Baton Rouge, 2005-1418 (La. 7/10/06), 935 So.2d 669, *citing* Costello v. Hardy, 03-1146 (La.1/21/04), 864 So.2d 129. "Statements are defamatory only if the words, taken in context, tend to injure the person's reputation, to expose the person to public ridicule, to deter others from associating or dealing with the person, or to deprive the person of public confidence in his or her occupation."  Davis v. Borskey,  660 So.2d 17, 22 (La.1995).

 In order to establish a claim for defamation in Louisiana, plaintiffs must prove: "1) a false and defamatory statement concerning another; 2) an unprivileged publication to a third party; 3) fault (negligence or greater) on the part of the publisher; and 4) resulting injury."  Id. Fault is malice, actual or implied.  Id.

Louisiana recognizes two types of defamatory words: defamatory *per se* and those that are susceptible of a defamatory meaning.  Id.  Defamation *per se* includes words "which by their very nature tend to injure one's personal or professional reputation" Id.  Upon proof of defamation *per se*, fault, i.e., falsity and malice are presumed and injury may be presumed.  Id.

Louisiana also recognizes certain privileges against defamation claims.  Specifically, a conditional privilege exists when a statement is made in good faith, on a matter in which the speaker had an interest or a duty, and to another person with a corresponding interest or duty. Smith v. Our Lady of the Lake Hospital, Inc., 93-2512, p. 15 (La.7/5/94), 639 So.2d 730, 743. "A statement is made in good faith when it is made with reasonable grounds for believing it to be true."  Wright v. Bennett, 2004-1944 , p.16 (La.App. 1 Cir. 2005), 924 So.2d 178, 188, *citing*

Ruffin v. Wal-Mart Stores, Inc., 2001-0613, p. 3 (La.App. 1st Cir.5/10/02), 818 So.2d 965,

967-968, *writ denied*, 2002-1636 (La.9/30/02), 825 So.2d 1200.

Under Texas law, in order to prove defamation, a private plaintiff must show: 1) a

published a statement; 2) that was defamatory to the plaintiff; 3) while acting negligently as to

the truth of the statement. WFAA-TV, Inc. v. McLemore, 978 S.W.2d 568, 571 (Tex.1998).

Texas law defines defamation as statements that tend to injure a person's reputation and thereby

expose the person to public hatred, contempt, ridicule, or financial injury or to impeach any

person's honesty, integrity, virtue, or reputation. Tex. Civ. Prac. & Rem.Code Ann. § 73.001

(West 2005). Texas also has two types of defamation: defamation *per quod* and defamation *per*

*se*. Moore v. Waldrop, 166 S.W.3d 380, 384 (Tex.App.-Waco 2005). Defamation *per quod*

includes statements that are actionable only upon allegation and proof of damages. Alaniz v.

Hoyt, 105 S.W.3d 330, 345 (Tex.App.-Corpus Christi 2003); *see also* Time, Inc. v. Firestone,

424 U.S. 448, 459, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976).  Statements are defamatory *per se* when

they are "obviously hurtful to plaintiff's reputation." Knox v. Taylor, 992 S.W.2d 40, 50

(Tex.App.-Houston [14th Dist.] 1999).  When defamation *per se* is proven, damages are

presumed.  Snead v. Redland Aggregates Ltd., 998 F.2d 1325, 1331 (5th Cir.1993).

Texas recognizes a qualified privilege against claims of defamation. "A qualified

privilege protects statements made in good faith on a subject matter in which the author has an

interest or with reference to which he has a duty to perform to another person having a

corresponding interest or duty." Halbert v. City of Sherman, 33 F.3d 526, 530 (5th Cir.1994)

*citing* Houston v. Grocers Supply Co., 625 S.W.2d 798, 800 (Tex.App.-Houston [14th Dist.]

1981).

25

Texas also has an action for business disparagement, which is similar to an action for defamation. "The action for defamation is to protect the personal reputation of the injured party, whereas the action for injurious falsehood or business disparagement is to protect the economic interests of the injured party against pecuniary loss." Hurlbut v. Gulf Atl. Life Ins. Co., 749 S.W.2d 762, 766 (Tex.1987). A claim for business disparagement is proven by showing publication by the defendant of disparaging words, that are false, with malice, lack of privilege, and proof of special damages. Prudential Ins. Co. v. Fin. Review Servs., Inc., 29 S.W.3d 74, 82 (Tex. 2000). "Regarding falsity, the common law presumed the defamatory statement to be false and truth was a defensive matter. The plaintiff in a business disparagement claim, however, must plead and prove the falsity of the statement as part of his cause of action." Hurlbut, 749 S.W.2d at 766. Likewise, there is a greater burden of proof on the plaintiff regarding fault in a business disparagement case in that the plaintiff must prove that the defendant "'knew of the falsity or acted with reckless disregard concerning it, or if he acted with ill will or intended to interfere in the economic interest of the plaintiff in an unprivileged fashion.'" Id. quoting Restatement (Second) of Torts § 623A. Further, in business disparagement case, plaintiff must prove actual pecuniary loss. Id.

Thus, although Louisiana and Texas have similar laws allowing for the recovery of damages when defamatory statements are made, they do conflict on when falsity, malice, and damages must be proven. Neither state has a higher standard of conduct, however, because they

26

both discourage the same type of behavior and both allow for similar defenses against the claims.[35]

### *State where conduct occurred*

Louisiana Civil Code Art. 3543 provides that with respect to issues pertaining to standards of conduct and safety, the law of the state where the conduct occurs applies to the claim when the injury also occurs in that state or "another state whose law did not provide for a higher standard of conduct."  As set forth above, neither Texas nor Louisiana has a higher standard of conduct regarding defamation claims.  Thus, the law applicable to the defamation claims is that of the state where the conduct occurred.

Plaintiffs attach three affidavits of witnesses describing allegedly defamatory comments made by employees of Southland about Fietz.[36]  Two of the affidavits set forth that the defamatory comments were made in Texas, while the other states that the affiant was in Texas when the statement was conveyed to him in a telephone conversation with a Southland.  Thus, two of the allegedly defamatory remarks made about Fietz occurred in Texas, while the third was received in Texas.  Accordingly, the undersigned concludes that Texas law is applicable to all defamation claims arising from the statements about Fietz.

With regard to defamatory statements allegedly made about Halter, plaintiffs cite Halter's deposition wherein he simply states that he was told by a business associate that during a conference call (he does not know who was involved in the conference call) someone at

---

[35] As set forth above, Louisiana requires proof of falsity and malice unless the statement was defamatory *per se*.  The requirements in Texas depend on whether the claim is for defamation of the person's personal reputation or for business disparagement, with a claim for defamatory remarks against personal reputation presuming falsity, while business disparagement claims require proof of falsity and pecuniary loss.

[36] Exhibits 10 (Affidavit of Richard Dowell), 11 (Affidavit of Jackie Harkey), and 12 (Robert Moore), Rec. Doc. 60.

27

Southland stated "those guys [Halter and Fietz] didn't know what they were doing, their persistency was bad, and they were spending too much money."[37]  The location of the business associate was not provided.  The only specificity regarding Halter's defamation claims was given in his response to Interrogatory No. 12, in which Halter identifies statements made about Fietz by Ned Abernathy and David Berringer to Jackie Harkey.[38]  Harkey's affidavit, which was attached to plaintiffs' motion in limine brief, states that Abernathy visited her office in Texas and made allegedly defamatory statements about Fietz.[39]  The only information regarding comments made by Berringer are in Richard Dowell's affidavit, wherein he states that Berringer contacted him by phone in Texas and made remarks about Fietz.[40]  Thus, this information shows that Halter relies on statements made in Texas as the basis for his defamation claims.  Accordingly, Texas law is applicable to those claims.

### *Conclusion*

Considering the foregoing, the following orders are entered:

**IT IS ORDERED** that defendant's Motion in Limine is **GRANTED in part and DENIED in part.**

**IT IS FURTHER ORDERED** that plaintiffs' motion is **GRANTED in part and DENIED in part.**

---

[37] Exhibit 1 (Deposition of Halter) at p. 205 to Rec. Doc. 60.

[38] Exhibit 3 to Rec. Doc. 80.

[39] Exhibit 11 (Affidavit of Jackie Harkey) to Rec. Doc. 60.

[40] Exhibit 10 (Affidavit of Richard Dowell) to Rec. Doc. 60.

28

**IT IS FURTHER ORDERED** that Alabama law is applicable to plaintiffs' claims of breach of contract and detrimental reliance.

**IT IS FURTHER ORDERED** that Louisiana law is applicable to plaintiffs' unjust enrichment claims.

**IT IS FURTHER ORDERED** that Texas law is applicable to the defamation claims.

Signed at Lafayette, Louisiana, on April 10, 2007.

Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)