RECEIVED

DEC - 7 2007

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

JAMES TRUETT FIETZ, KYLE W.
HALTER AND AMERICAN
PREARRANGED SERVICE, INC.

CIVIL ACTION NO. 05-64

VERSUS

JUDGE DOHERTY

SOUTHLAND NATIONAL
INSURANCE CORPORATION

MAGISTRATE JUDGE METHVIN

## MEMORANDUM RULING

Currently pending before the Court is a "Re-Urged Motion for Summary Judgment" [Doc.

103] filed by defendant, Southland National Insurance Corporation ("Southland").[1]  Southland re-

urges the Court for summary judgment in its favor, dismissing with prejudice plaintiffs' claims for:

(1) breach of contract, (2) promissory estoppel, (3) unjust enrichment, and (4) defamation.  The

motion is opposed by plaintiffs. [Doc. 135] All briefing is now completed, and the motion has been

taken under advisement.

### I.  Factual and Procedural Background

On January 15, 2003, plaintiff Kyle W. Halter telephoned Southland's President, Dennis

Painter, to discuss a possible business arrangement with Southland.[2]  At the time, Mr. Halter, as well

---

[1]Southland previously filed a motion for summary judgment seeking judgment in its favor on the
same claims addressed in this motion. [Doc. 31]  That motion was denied on September 6, 2007 for
failure to carry the burden of proof.  Specifically, the parties disagreed as to the law applicable to each
claim, and had not sufficiently briefed the choice of law issue such that the Court could rule on the
motion. [Doc. 53]

[2] Southland specializes in the sale of insurance designed to fund prearranged funerals.  Most of
Southland's products are sold to customers through funeral home directors or employees of funeral
homes. These "agents" earn a commission for each policy they write for Southland. [Doc. 103-4, p.3] In

as plaintiff James Truett Fietz, were planning on terminating their employment with Mission Life Insurance Company, a competitor of Southland's.[3] According to plaintiffs, Mr. Halter asked whether Southland was interested in discussing a possible third-party business arrangement with plaintiffs, whereby plaintiffs would market Southland's pre-need burial insurance policies to funeral homes. [Depo. of Halter at 69-70]  According to plaintiffs, Mr. Painter told Mr. Halter Southland did not utilize third-party business arrangements, but he invited Mr. Halter to come to Southland's office in Tuscaloosa to discuss the matter further.[4]  [Id. at 70, 81]

On January 29, 2003, Mr. Halter traveled from Louisiana to Tuscaloosa and met with Mr. Painter for several hours to further discuss a potential business arrangement.  [Id. at 81]  According to plaintiffs, Southland wanted to grow its business in its "Western Division," and Southland believed because of plaintiffs' contacts in the industry, as well as the number of agents plaintiffs could bring from their former employer, plaintiffs could help transform Southland from a regional company to a national company.  [Id. at 73, 105]  Plaintiffs contend during the meeting (as well as at later times), Mr. Painter made the following offer: if plaintiffs "partnered" with Southland, they would receive override commissions for all policies sold by agents plaintiffs brought to or recruited for Southland, for as long as those agents wrote Southland policies. [Halter at 71, 78-79; Doc. 1 at ¶¶ 13, 14, 15; Doc. 135 at 48]  Plaintiffs assert Mr. Painter's statement meant override commissions

order to sell Southland policies, an agent must sign Southland's "Commission Contract," which states in pertinent part, "Agent is an independent contractor and not an employee . . . This contract may be terminated by either party by giving the other party at least 30 days advance written notice." [Doc. 135, p.3, Exs. G, H, ¶¶ 2.3, 7]

[3] Like Southland, Mission Life was also in the business of selling insurance designed to fund prearranged funerals.  Mission Life has ceased writing such policies.

[4] At the time of the call, Mr. Halter was in Lafayette, Louisiana and Mr. Painter was in Tuscaloosa, Alabama. Mr. Halter is a citizen of Louisiana, Mr. Fietz is a citizen of Texas, and Southland is a citizen of Alabama.

(for both new policies sold and renewals of previously sold policies) were to be paid to plaintiffs *even if plaintiffs' employment arrangement with Southland came to an end;* [Halter at 71; Fietz at 62-69] defendant disagrees.

Plaintiffs admit their interpretation of the discussed business arrangement, which would provide plaintiffs with post-termination override commissions, was highly unusual within their industry. In fact, plaintiffs testified they have never seen such an arrangement in the industry during their "lengthy" careers. [See e.g. Halter at 83-84, 90; Fietz at 76; Doc. 1, ¶7] Plaintiffs admit the standard arrangement in the industry is to provide override commissions post-termination only on *renewals* of policies which *were originally sold while plaintiffs would have been employed by the issuing agency.* Stated otherwise, under the standard industry arrangement, plaintiffs (post-termination) would be entitled only to override commissions on policies *which were renewed* after plaintiffs' termination, and originally had been sold by "agents" plaintiffs had recruited *while plaintiffs were employed with Southland.* Plaintiffs admit under the standard industry arrangement, plaintiffs would not be entitled to override commissions on *new* business, written *after* their termination, by agents plaintiffs had recruited during their tenure with Southland. [Id.] Plaintiffs admit, the argued business arrangement is highly unusual, but argued it was motivated by defendant's desire to develop business in states west of Louisiana and to become a nationwide company, through the use of plaintiffs' resources and contacts.[5] [See e.g., Halter at 73] According to Mr. Halter, after the January meeting, Mr. Painter telephoned him to say that the Board of Directors "was excited about partnering" with plaintiffs; [Id. at 108] however, the percentage of override commissions would be less than originally discussed. Mr. Halter asserts he accepted the

---

[5] At his deposition, Mr. Halter asserted he and Mr. Fietz would be able to "double the size of what they [Southland] were doing." [Halter at 106-107]

offer made on behalf of himself and Mr. Fietz. [Id. at 109]  Shortly thereafter, Mr. Halter, Mr. Fietz and two other employees of Mission Life who wanted to become Southland employees flew to Tuscaloosa to meet with Mr. Painter and other Southland employees.  [Id. at 110-111] According to Mr. Halter, during this meeting details of the "partnership" were not discussed. [Id. at 111] Rather, it was more of "an introduction meeting" to introduce Mr. Fietz and the two other Mission Life employees to Southland. [Halter at 109, 111-112]

Southland provides a vastly different portrayal of the events leading up to its business arrangement with Mssrs. Halter and Fietz.  According to Southland, Mr. Painter *hired* plaintiffs to work for Southland *as "regional managers"* – not as partners. [Doc. 103-4, p. 4]  According to Southland, like other regional managers it employed, plaintiffs were to be responsible for "overseeing, managing, and recruiting agents in particular territories."[6] [Id.]  In return, plaintiffs would receive "base salaries of $36,000 per year, employee benefits and expense reimbursements, among other things." [Id.]  Plaintiffs "would also receive override commissions for any business written by the agents they recruited to write policies in their territories for Southland." [Id.] Southland vehemently denies it made an offer of any nature to plaintiffs, whereby plaintiffs were to receive override commissions on new policies sold by agents plaintiffs had recruited <u>after</u> plaintiffs were no longer employed by Southland.[7]

---

[6] The Court notes plaintiffs have not opposed Southland's statement that all regional managers it employs are responsible for recruiting agents.

[7] One of the other Mission Life employees who attended the February 10, 2003 meeting - Larry Lambert - also became a Regional Manager for Southland.  However, plaintiffs admit Southland did not offer or grant Mr. Lambert post-termination overrides on new business sold by agents he recruited. [Halter at 112-113] When Mr. Halter was asked at his deposition why *he* did not inform Mr. Lambert of his and Mr. Fietz's arrangement, he responded, "At that point, I don't know that – Mr. Lambert didn't have a large volume of business." [Id. at 113] Additionally, Mr. Halter testified he was aware of no one at Southland, other than Mr. Painter, who knew of the alleged agreement to provide plaintiffs with post-termination override commissions, although he presumed the Board was aware. [Halter at 85-86] When

On March 20, 2003, Mr. Painter sent plaintiffs separate letters (the bodies of which are identical), which read in pertinent part as follows:

> Enclosed are your *employment papers* to begin your career with Southland National *as a Regional Manager.* I am excited about you *becoming a part of the Southland team.*
>
> As per our agreement, your base salary is $36,000 per year beginning March 24, 2003. In addition, *you will be paid override commissions on business generated in your region.* You will also be eligible for the benefits and expense reimbursements general [sic] *accorded our Regional Managers.* In addition, you will receive a monthly business development allowance to supplement your salary.
>
> The business development allowance is to allow you time to get your production going and to offset renewals you might be delayed in receiving from your prior company. As per our mutual agreement any allowance paid to you in place of your renewal commissions will be repaid Southland should you receive the renewal commissions that were replaced by the bonus.
>
> Your business development allowance is $14,000 per month. This amount will be reviewed and evaluated with you on a monthly basis as production increases and the status and amount of your renewal commissions are clarified.
>
> [Kyle/Truett], Randy, the entire Southland team, and I look forward to working, with you. The opportunities before us are great and our expectations are high! With you on our team, the future of Southland is even brighter.
>
> Please do not hesitate to call Randy or me with any questions you may have. We look forward to meeting with you again soon.
>
> Dennis E. Painter, CPC
> President

[Doc. 103; Exs. E, F] (emphasis added). Attached to the letters were "Commission Contracts," as well as *employment applications*, enrollment forms for health and disability insurance, U.S. Department of Justice Employment Eligibility Verifications, defendant's Drug and Alcohol Policy,

---

asked if anyone at Southland, other than Mr. Painter, ever told Mr. Fietz he would receive post-termination override commissions, Mr. Fietz answered, "I would have to say, I'm not absolutely positive that anyone else at Southland conveyed that. If anyone else did, in a conversation that I'm not absolutely positive about, it would have been Randy Mathews [a Southland Vice President]." [Fietz at 96]

and W-4 forms.[8] [Doc. 103, Exs. G-P]

On a subsequent date, the three men had a conference call during which they discussed the fact that the Commission Contracts only dealt with policies personally sold by plaintiffs (i.e. "agent contracts"), rather than override commissions on policies sold by agents plaintiffs recruited. [Halter at 114; Painter at 30-31]  Plaintiffs contend Mr. Painter explained the Commission Contracts were simply standard contracts executed by Southland personnel, and all agreed the contracts would not cover the separate "partnering agreement." [Halter at 114]  Mr. Painter on the other hand testified he did have a discussion with plaintiffs about the Commission Contracts, however he merely told plaintiffs execution of the Commission Contract was necessary, as they were going "to receive overwrites [sic] on business and by law you can't really receive an overwrite [sic] on business without having a license and a commission contract, okay, involved." [Painter at 30-31] Mr. Painter makes no mention of any discussion regarding a separate partnering agreement.[9] In fact, throughout

---

[8] Plaintiffs point out many of the attached documents list New South Federal Savings Bank (not Southland) as plaintiffs' employer. (Defendant argues New South Federal Savings Bank is Southland's parent company, and it handles Southland's employment applications, benefits and human resources. [Doc. 103, pp. 14, 16])  Plaintiffs additionally note the Commission Contracts, entered into between Southland and Mssrs. Halter and Fietz, state "agent is an independent contractor and not an employee." Plaintiffs argue these two facts lend support to their position they were partners with Southland, rather than employees of Southland. [Doc. 135, pp. 37-39] However, at page 45 of their opposition memorandum, *plaintiffs* "object to these documents [Exs. G-N] offered from a distinct legal entity, New South Federal Bank, which is not a party to this litigation." That objection is **OVERRULED**, as the Court finds the documents are relevant to the issue of the exact nature of the relationship between the parties.

[9] Mr. Painter does admit to using the term "partner" at various other points in his deposition. However, he testified he did not use the term in the formal, legal sense, but in a manner more akin to (using the court's terminology) "puffery." [Painter at 13, 14, 43, 51, 52] For example, when asked if he used the word "partner," Mr. Painter responded:

> We used the word partner quite often in recruiting because we felt like if our -- the people we brought on board took more responsibility for their areas . . . I would have probably used that word that -- that, you know, we considered our regional managers in a sense and other people that work with us as partners in business. . . .

his deposition, Mr. Painter denies any recollection of ever having any discussion with plaintiffs or anyone at Southland about paying override commissions to plaintiffs on new business sold by agents plaintiffs recruited *after* plaintiffs no longer worked for Southland. [Painter at 48-52; see also, Painter at 16-17, 50-51 (to Mr. Painter's understanding, plaintiffs would *only* receive override commissions on new business written by agents they recruited *while* they worked for Southland - in other words, the standard industry arrangement.] Following the conversation, Mr. Halter and Mr. Fietz completed the paperwork and returned it to Southland.

In May of 2004, Southland's Board of Directors terminated Mr. Painter because, according to Southland, he failed to adopt the Board's more conservative business model despite many opportunities, and because he clashed with board member Robert W. Jennings, Jr. on various other issues. [Doc. 103, p. 11] Shortly thereafter, Southland sent termination letters to Mr. Halter and Mr. Fietz. The letters read in pertinent part:

> This letter will serve as written notice that the Commission Contract with Southland National Insurance Corporation dated . . . [April 8, 2003 for Mr. Halter; March 24, 2003 for Mr. Fietz] including all amendments, supplements, and addenda thereto and the letter dated March 20, 2003 from Dennis Painter (copy of letter and Commission Contract are attached hereto) are terminated. Termination will become effective thirty (30) days from the date this letter is postmarked, which is . . . [June 26, 2004 for Mr. Fietz; July 1, 2004 for Mr. Halter].

> Termination of the above Commission Contract and letter, of course, terminates our compensation arrangements that we have with you. We will continue to pay you for any business currently in process or for which any commissions remain unpaid through the date of termination.

[Doc. 135, Exs. 7 and 8]

---

. . .

I told him [Mr. Halter] it would probably be better to partner with us than to go out on their own because of our experience and other things like that. [Id. at 13-14]

According to plaintiffs:

> At the same time Southland informed Mr. Halter and Mr. Fietz it was terminating its business arrangement with them, it notified 325 agents (which included all the agents in Texas and New Mexico) that it was terminating their appointments as Southland agents.

> One month after Southland terminated its business arrangement with Mr. Halter, Mr. Fietz, and appointments of the 325 agents recruited to Southland by Mr. Halter and Mr. Fietz, Southland sent letters to those same agents and told them that it was continuing business in their areas and wanted their business. . . .
> . . . .

> Southland abruptly ended the business arrangement and refused to pay Mr. Halter and Mr. Fietz override commissions on policies written after July 1, 2004 by agents, who continued to sell Southland polices after that date, even though those agents were brought to Southland by Mr. Halter and Mr. Fietz. . . .

> . . . Southland maintains that although it has retained about 50 of the 479 agents whom Halter and Mr. Fietz had persuaded to become Southland agents and these agents continue to sell Southland policies, it owes Mr. Halter and Mr. Fietz no override commissions on policies these agents continue to sell.

[Doc. 135, pp. 2, 48-49 (footnotes omitted)]  Following their termination, Mr. Halter and Mr. Fietz

formed American Prearranged Services, Inc. ("APSI") (a plaintiff herein), which directly competes

with Southland in the selling of prearranged insurance policies.[10]

On December 7, 2004, plaintiffs filed suit in the 15th Judicial District Court, Lafayette Parish,

Louisiana. [Doc. 1]  On January 13, 2005, Southland removed the case to this court based on

diversity jurisdiction.[11]

---

[10] Mr. Halter is the sole shareholder of APSI. [Doc. 135, p. 9]

[11] All parties appear to agree plaintiffs were entitled to receive (and are receiving) *renewal* override commissions.  The disagreement extends only to whether or not plaintiffs are entitled to override commissions on *new* business written after plaintiffs were terminated by agents plaintiffs recruited . [Doc. 135, pp. 30, 48]

## II. **Summary Judgment Standard**

"A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory

judgment is sought may, at any time, move with or without supporting affidavits for a summary

judgment in the party's favor as to all or any part thereof." FED. R. CIV. PROC. 56(b).  Summary

judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. PROC. 56(c).

> When a motion for summary judgment is made and supported as provided in this
> rule, an adverse party may not rest upon the mere allegations or denials of the adverse
> party's pleading, but the adverse party's response by affidavits or as otherwise
> provided in this rule, must set forth specific facts showing that there is a genuine
> issue for trial.  If the adverse party does not so respond, summary judgment, if
> appropriate, shall be entered against the adverse party.

FED. R. CIV. PROC. 56(e).

As summarized by the Fifth Circuit in <u>Lindsey v. Sears Roebuck and Co.,</u> 16 F.3d 616, 618

(5th Cir. 1994):

> When seeking summary judgment, the movant bears the initial responsibility
> of demonstrating the absence of an issue of material fact with respect to those issues
> on which the movant bears the burden of proof at trial. <u>Celotex Corp. v. Catrett,</u> 477
> U.S. 317 (1986). However, where the non-movant bears the burden of proof at trial,
> the movant may merely point to an absence of evidence, thus shifting to the
> non-movant the burden of demonstrating by competent summary judgment proof that
> there is an issue of material fact warranting trial. Id. at 322; *see also,* <u>Moody v.
> Jefferson Parish School Board,</u> 2 F.3d 604, 606 (5th Cir.1993); <u>Duplantis v. Shell
> Offshore, Inc.,</u> 948 F.2d 187, 190 (5th Cir.1991). Only when "there is sufficient
> evidence favoring the nonmoving party for a jury to return a verdict for that party"
> is a full trial on the merits warranted. <u>Anderson v. Liberty Lobby, Inc.,</u> 477 U.S. 242,
> 249 (1986).

The Supreme Court has instructed:

The plain language of Rule 56(c) <u>mandates</u> the entry of summary judgment, after
adequate time for discovery and upon motion, against a party who fails to make a

-9-

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Where no such showing is made, "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."

. . . .

. . . In ruling upon a Rule 56 motion, "a District Court must resolve any factual issues of controversy in favor of the non-moving party" only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied. That is a world apart from "assuming" that general averments embrace the "specific facts" needed to sustain the complaint. As set forth above, Rule 56(e) provides that judgment "shall be entered" against the nonmoving party unless affidavits or other evidence "set forth specific facts showing that there is a genuine issue for trial." The object of this provision is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit. Rather, the purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues.

Lujan v. National Wildlife Federation, 497 U.S. 871, 884, 888-89 (1990)(quoting Celotex Corp. v.

Catrett, 477 U.S. 317, 322-23 (1986)).

The Fifth Circuit has further elaborated:

[The parties'] burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence.  We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts. ...[S]ummary judgment is appropriate in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.

Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)(citations and internal

quotations omitted).

Finally, in evaluating evidence to determine whether a factual dispute exists, "credibility determinations are not part of the summary judgment analysis." Id. To the contrary, "in reviewing all the evidence, the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party, as well as that evidence supporting the moving party that is uncontradicted and unimpeached." Roberts v. Cardinal Servs., 266 F.3d 368, 373 (5th Cir. 2001).

### III. Breach of Contract [12] [13]

In support of its motion for summary judgment for dismissal of plaintiff's claim of breach of contract, defendant argues: (1) the letters dated March 20, 2003 from Mr. Painter to Mssrs. Fietz and Halter "constitute written employment contracts between the parties," evidencing the nature of

---

[12] The Magistrate Judge previously issued a ruling on the parties' motions in limine regarding the law applicable to each of plaintiffs' claims. [Doc. 98]  In that ruling, the Magistrate Judge concluded Alabama law applies to plaintiffs' claim for breach of contract. Plaintiffs did not appeal the ruling to this Court, and the delay for filing such an appeal has passed.  (See L.R. 7.4.1W.)  As such, the parties have addressed this claim under Alabama law, and the Court will apply Alabama law to this claim.

[13] Throughout the fifty-one page opposition memorandum, plaintiff counsel repeats various statements contained in a Statement of Disputed Material Facts submitted by defendant in support of its opposition to a motion for partial summary judgment previously filed by plaintiff. [Docs. 39, 43] Plaintiff counsel uses these previously made statements to argue that because defendant asserted at an earlier time certain facts were in dispute and therefore plaintiff was not entitled to summary judgment, defendant should now be foreclosed from arguing in the current motion that the facts are not in dispute and summary judgment is appropriate.  Local Rule 56.2 requires the non-movant to respond to each of the movant's statements with which it disagrees by stating that fact is in dispute, otherwise, those statements are "deemed admitted, for purposes of the motion."  Plaintiff counsel also spends numerous pages of his brief arguing defendant previously filed a Statement of Undisputed Material Facts in support of an earlier summary judgment motion, and because the Court denied that motion, it should deny the current motion as well.  (As best the Court can divine, plaintiff counsel is arguing the Court previously found there were factual issues which precluded summary judgment, and because "the facts have not changed one iota" since that motion was filed, summary judgment remains inappropriate. [Doc. 135, p.4]) The Court finds that argument also is without merit.  Both plaintiffs' and defendant's previously filed summary judgement motions were denied *for failure to carry the burden of proof*, more particularly, due to the parties' failure to establish the law applicable to each claim.  The merits of those motions were not addressed, and thus, the Court did not find there were sufficient factual issues such that summary judgment was unwarranted.

the parties' relationship as employer/employee and not as business partners [Doc. 103-4, p. 12]; (2)

any alleged oral contract entitling plaintiffs to "perpetual overrides" is barred by the Alabama Statute

of Frauds; and (3) alternatively, if the Statute of Frauds does not apply, the parol evidence rule

precludes any testimony regarding Mr. Painter's alleged oral promise to provide plaintiff perpetual

override commissions.

Contrarily, plaintiffs argue: (1) the March 20, 2003 letters from Mr. Painter merely

constituted a *proposal* and were not valid contracts per se[14]; (2) Mr. Fietz, Mr. Halter and Southland

entered into a valid "oral partnership agreement without a term," and such an oral contract is not

subject to the Statute of Frauds[15]; (3) the parol evidence rule does not preclude testimony about the

---

[14] Plaintiffs rely on Mr. Painter's deposition testimony in support. The pertinent testimony reads as follows:

> I think included in that package also was some employment papers that we would have sent them which – and if I recall, I probably sent them a cover letter stating or outlining what – what – you know, what we proposed, okay. You know, I don't – like I say, that's been a long time but normally that's what we would have done – I would have done is send them a cover letter with these materials for them to outline, you know, what we were going to do.

[Halter at pp. 30-31]

[15] At the outset, the Court notes it finds defendant has failed to carry its burden of proof, as movant, with regard to its argument that any alleged oral contract entitling plaintiffs to perpetual overrides is barred by the Alabama Statute of Frauds, Ala. Code 1975 § 8-9-2. The statute states in pertinent part:

> In the following cases, every agreement is void unless such agreement or some note or memorandum thereof expressing the consideration is in writing and subscribed by the party to be charged therewith or some other person by him thereunto lawfully authorized in writing:

> (1) Every agreement which, by its terms, is not to be performed within one year from the making thereof . . .

Defendant argues any claim for breach of an oral contract for "perpetual overrides" (i.e. override commissions which defendant argues would be owed "for the rest of their lives") should fail on its face, because the statute of frauds prohibits the enforcement of oral contracts with a duration of more than one

agreement entered into by the parties[16]; and (4) "the only written contracts between the parties are

---

year. [Doc. 103, p.12]  However, as will be discussed in more detail, there does exist in this matter a
"writing" - the letter to plaintiffs from Mr. Painter stating plaintiffs "will be paid override commissions."
Whether that letter is sufficient to constitute a "writing" under the Statute of Frauds has not been
addressed by defendant.  Of further import, FED. R. CIV. P. 8(c) requires "[i]n pleading to a preceding
pleading, a party **shall** set forth affirmatively . . . statute of frauds . . . and any other matter constituting
an avoidance or affirmative defense." (Emphasis added.) (The Court notes Alabama law contains
language identical to FED. R. CIV. P. 8(c).  See ARCP Rule 8 (2007))  Defendant did not plead the statue
of frauds as an affirmative defense in its answer. [Doc. 9] Whether defendant can raise that affirmative
defense at this point has not been addressed, and thus, is not properly before the Court.

[16] The Court notes plaintiffs have cited no legal support for their third argument - that the parol
evidence rule does not apply in this matter.  Instead, plaintiffs devote fifteen pages of their brief to
making an obtuse and disjointed argument as to why the Court should find a partnership contract exists in
this matter, relying solely on parol evidence and argument of counsel.  As best the Court can summarize,
plaintiffs' argument is as follows:

- Southland used parol evidence "to explain the significance of the written 'Commission
  Contracts'" (presumably implying plaintiffs should likewise be able to rely on parol
  evidence)[Doc. 125, p.33];
- Mr. Painter testified "his March 20, 2003 letters outlined a proposal" (presumably arguing the
  letters are not contracts) [Id.];
- Southland is asking the Court to reject the fact the Commission Contracts state plaintiffs are
  independent contractors - not employees [Id. at 33-34];
- Southland is asking the Court "to ignore its previous admissions" contained in Southland's
  Answer, where Southland stated "plaintiffs were 'at-will' employees" [Id. at 34];
- There are no written employment contracts between the parties, and "in fact, the only written
  contracts between the parties are the 'Commission Contracts' - the ones that say Mr. Halter and
  Mr. Fietz were not employees" [Id. p. 35];
- Plaintiff counsel strings together, into one block quotation, various portions of deposition
  testimony and responses to discovery, to support his argument Mr. Painter told plaintiffs the
  "'Commission Contract' ... and the other papers...did not effect or cover the partnering agreement
  Southland and Mr. Halter had agreed upon" [Id. p. 35];
- Plaintiff counsel argues the letter from Mr. Jennings informing plaintiffs of their termination
  only terminated the Commission Contracts, which identify plaintiffs as independent contractors -
  not employees [Id. at 37];
- The other documents attached to Mr. Painter's letter [documents necessary for plaintiff's to
  receive various employment benefits] list the employer as New South Federal Bank, not
  Southland, and therefore defendant's argument plaintiffs were Southland employees (in part due
  to their receipt of employee benefits) fails because the benefits were provided by New Federal
  South Bank and not Southland.  [Id. at 38];
- Plaintiff counsel attempts to rehabilitate the testimony of Mr. Painter, stating Mr. Painter merely
  "expressed his lay opinion that the 'partnership' was not 'a legal partnership'" [Id. at 40];
- Plaintiffs persuaded numerous agents to work for Southland and brought a large volume of
  business to Southland pursuant to plaintiff's "obligation" under the alleged partnership
  agreement, and Southland should be "estopped to deny the partnership" [Id. at 43-44];
- Plaintiffs are naive regarding tax matters and were not aware partners were to file a K-1 rather

-13-

the 'Commission Contracts' – the ones that say Mr. Halter and Mr. Fietz were not employees" but rather, independent contractors.  [Doc. 135, p. 35]

## IV.   Alabama Law - Contract

Under Alabama law, the requisite elements of a contract include: "an offer and an acceptance, consideration, and mutual assent to the terms essential to the formation of the contract." Ex parte Bill Heard Chevrolet, Inc., 927 So.2d 792, 801 (Ala. 2005) (quoting Strength v. Alabama Dep't. of Fin., 622 So.2d 1283, 1289 (Ala. 1993)).[17]  Additionally, not all contracts are "formal contracts"; many valid contracts are "informal contracts."  See e.g., Hishon v. King & Spalding, 467 U.S. 69, 74 (1984)("an informal contract of employment may arise by the simple act of handing a job applicant a shovel and providing a workplace.)[18]

With regard to parol evidence, the Alabama Supreme Court has stated the following:

> The general rule of contract law is that, if a written contract exists, the rights of the parties are controlled by that contract, and parol evidence is not admissible to contradict, vary, add to, or subtract from its terms.  The rule does allow the introduction of extrinsic evidence in the event of fraud, mistake, or ambiguity. . . .
>
> Whether a contract is ambiguous is a question of law.  If the court determines that a contract is ambiguous, extrinsic evidence will be allowed to clarify the

---

than a W-2, despite the fact Mr. Halter's CPA had prepared a K-1 for a horse venture of Mr. Halter [Id. at 44];

[17] An earlier Alabama decision states "the elements of a contract are agreement, consideration, two or more contracting parties, legal object, and capacity."  Lawler Mobile Homes, Inc. v. Tarver, 492 So.2d 297, 303 (Ala. 1986).  As no issue has been raised as to the legality of the contract or the capacity of the parties, the Court presumes all parties agree those elements are satisfied, and therefore, the Court will not address those elements.

[18] See also, Udcoff v. Freidman, 614 So.2d 436 (Ala. 1993), wherein the Supreme Court of Alabama dealt with a letter agreement quite similar to the letters at issue in this matter.  There, the Court stated, "In this case, there was no formal written contract for employment, except the June 2 letter from Steiner/Bressler Advertising to Udcoff."  Although the sentence is ambiguous as to whether or not the Alabama court deemed the letter to be a formal or informal contract, nevertheless, the sentence is clear that the Court found the letter constituted a contract of some ilk.

-14-

contract. However, once a court determines that a contract is unambiguous, parol or extrinsic evidence will not be allowed as to that contract. Generally, once a court determines that no ambiguity exists in the basic contract, it cannot proceed to examine extrinsic evidence.

   . . .

When the parties evidence their agreement by a writing, all oral discussion, negotiations, or agreements had or made prior to the execution of the written contract, are merged into the final agreement.

Pime-Shatten Development Co. v. Birmingham Cable Communications, Inc., 569 So.2d 332, 334

(Ala. 1990) (internal citations omitted).  As stated by another court, "[A]bsent some evidence of

fraud, mistake, or illegality, a party to an unambiguous written contract cannot offer parol, or

extrinsic, evidence of prior or contemporaneous oral agreements to change, alter, or contradict the

terms of the contract." Environmental Sys., Inc. v. Rexham Corp., 624 So.2d 1379, 1381 (Ala.1993)

(emphasis added).

Under Alabama law, "an ambiguity exists where a term is *reasonably* subject to more than

one interpretation."  Ex parte Awtrey Realty Co., Inc., 827 So.2d 104, 108 (Ala. 2001)(emphasis

added).[19] **However, "[a]n undefined word or phrase . . . does not create an inherent ambiguity.**

**To the contrary, where questions arise as to the meaning of an undefined word or phrase, the**

**Court should simply give the undefined word or phrase the same meaning that a person of**

**ordinary intelligence would give it."** Twin City Fire Ins., Co. v. Alfa Mut. Ins. Co., 817 So.2d 687,

---

[19] See also, FabArc Steel Supply, Inc. v. Composite Const. Systems, Inc., 914 So.2d 344, 357 (Ala. 2005)(internal citations and quotations omitted):

If the court determines that the terms are ambiguous (susceptible of more than one reasonable meaning), then the court must use established rules of contract construction to resolve the ambiguity.  If all other rules of contract construction fail to resolve the ambiguity, then, under the rule of *contra proferentum*, any ambiguity must be construed against the drafter of the contract.  However, the rule of *contra proferentem* is generally a rule of last resort that should be applied only when other rules of construction have been exhausted.

692 (Ala. 2001)(noting also, "ambiguities are not to be inserted by strained or twisted reasoning.") (emphasis added).   Moreover, "*[t]he mere fact that adverse parties contend for different constructions does not in itself force the conclusion that the disputed language is ambiguous.*" Awtrey at 108 (emphasis added).

The Court further notes that as early as at least 1871, the United States Supreme Court set forth a similar rule:

> In the absence of an express direction on the subject, extrinsic evidence must of necessity be resorted to in order to find out which mode was adopted by the parties, and what extrinsic evidence is better to ascertain this than that of usage? *If a person of a particular occupation in a certain place makes an agreement by virtue of which something is to be done in that place, and this is uniformly done in a certain way by persons of the same occupation in the same place,* it is but reasonable to assume that the parties contracting about it, *and specifying no manner of doing it different from the ordinary one,* meant that **the ordinary one and no other should be followed**. ***Parties who contract on a subject-matter concerning which known usages prevail, by implication incorporate them into their agreement, if nothing is said to the contrary***.
>
> The evidence in the present case did not tend to contradict the contract, but to define its meaning, in an important point, where, by its written terms, it was left undefined. This, it is settled, may be done.

Robinson v. U.S., 80 U.S. 363, 366 (1871) (emphasis added) (affirming trial court's finding, based on witness testimony, that it was the custom in California to deliver barley in sacks rather than in bulk, unless the contract expressly stipulated otherwise)

However, there also appears to exist under Alabama law a line of cases addressing contracts that are partly written and partly oral.  In Lawler Mobile Homes v. Tarver, 492 So.2d 297 (Ala. 1986), the buyer of a mobile home brought suit against the seller for breach of contract.  The parties had executed a purchase agreement, which contained a description of the make and serial number of the mobile home to be purchased, the dimensions of the mobile home, the fact that it was a used home, and a notation of a $100.00 deposit. The purchase agreement did not state the sales price,

interest rate, or amount of monthly payments.  The Court found plaintiff had put forth sufficient evidence at trial of the existence of a contract, such that defendant's motion for directed verdict was properly denied by the trial court.  Though not explicitly stated, the Court appears to have found sufficient evidence of a valid contract, which was partially written (as evidenced by the purchase agreement) and partially oral.[20]  The Court stated:

> We first note that a contract may consist of several communications between the parties, some in writing and some oral, each constituting a link in the chain which comprises the entire contract.  The purchase agreement was not the only evidence of the contract.  Subsequent discussions and interactions between Tarver and Wilkes were properly considered and, taken as a whole, were sufficient evidence of a contract to buy and sell a mobile home.

Id. at 304.[21]

Finally, where a contract is unambiguous, "its construction and effect are questions of law which may be decided, under appropriate circumstances, by summary judgment."  Warrior Drilling & Engineering Co. v. King, 446 So.2d 31, 33 (Ala. 1984).  However, summary judgment is not

---

[20] Further support for this Court's interpretation of the Lawler court's ruling is found in the Alabama Pattern Jury Instructions Civil, 10A.07 "Oral Contracts" (2nd ed., 2006) which states in pertinent part:

A contract may be written or oral.  Oral contracts are just as valid as written contracts.

Notes on Use

Use this instruction when the action is based on an oral contract or a contract partly written and partly oral.

In the absence of a statute requiring a contract to be written or evidenced by writing, a valid contract may be partly written and partly oral. Lawler Mobile Homes, Inc. v. Tarver, 492 So. 2d 297 (Ala. 1986).

[21] While at first glance, the two lines of cases seem to be at odds, perhaps they can be reconciled by recognizing oral agreements can comprise part of an entire contract, but if the oral agreement is entered into prior to or contemporaneously with the written agreement, the oral agreement cannot "change, alter, or contradict the terms of the contract," but may merely add to, supplement, or clarify the terms contained in the written portion of the contract.

appropriate where ambiguity exists in the contract. Id. at 33.  As noted by the Alabama Supreme Court:

> Under the prevailing rule of law in Alabama it is incumbent upon the trial court to determine the force and effect of the terms of a contract, as a matter of law, when such terms are clear and unambiguous.  It is also the duty of the trial court to ascertain whether the contract is ambiguous in light of its terms.  Should the trial court determine a contract to be ambiguous, yet not void for uncertainty, the question of the true meaning of the contract becomes an issue for the jury to decide. To aid the jury in this determination, evidence of facts and circumstances aliunde (from another source) or in pais (outside the record of the contract) may be introduced to aid the jury in its clarification of the terms of the contract; it then becomes the province of the jury to draw inferences and ascertain those facts from which the true meaning of the contract's terms can be determined.[22]

Miles College, Inc. v. Oliver, 382 So.2d 510, 511 (Ala. 1980) (citations omitted) (holding trial court erred by submitting question to jury of whether defendants followed procedures set forth in handbook for termination of tenured professor, where procedures were clearly delineated in handbook, the handbook was unambiguous, and thus, interpretation of the contract was a question of law for determination by the court).

Before turning our attention to interpretation of the parties' contract in this matter, the Court

---

[22] Although at first blush, the cases cited in the above paragraph (Warrior Drilling and Miles College) seem at odds with other cases cited herein (Twin City, Awtrey, and Robinson), it appears the cases can be reconciled by recognizing contracts containing an ambiguity in the form of an undefined word or phrase are appropriately resolved on summary judgment if the court can supply the word or phrase's ordinary meaning or usage.  Only where there exists a true ambiguity in the contract - i.e., a word or phrase without an "ordinary meaning," or a word or phrase susceptible to conflicting meanings - should the Court submit interpretation of the contract to a jury.  Compare McKenzie v. Wimberly, 5 So. 468 (Ala. 1889) (Where contract described timber sold as "timber 12 inches heart and up," and conflicting testimony was submitted concerning the phrase's meaning, the question as to the proper rule for the measurement should have gone to the jury) and Warrior Drilling (Where there existed three overlapping oil and gas leases, each of which - standing alone - was unambiguous, issues of material fact arose as to whether the second executed lease had terminated for failure of lessee to make delay rental payments, and whether third executed lease constituted novation of second executed lease) with Twin Cities (where insurance contract did not define term "hired auto," thus making the policy unclear and subject to different interpretations, court had to define the term using its plain, reasonable, and ordinary meaning; held: trial court properly entered summary judgment in favor of defendant).

first disposes of plaintiffs' argument they entered into an oral partnership contract with Southland.

As noted by the Alabama Supreme Court in Woods v. Phillips, 849 So.2d 951, n.2 (Ala. 2002)

(internal citations and quotations omitted; brackets in original):

> There is no arbitrary test as to whether a partnership exists, but such a determination
> will be made upon all of the attendant circumstances. A partnership arises only from
> an express or implied agreement among the parties and is never established by
> implication or by operation of law. This Court, in Waters v. Union Bank of Repton,
> 370 So.2d 957 (Ala. 1979), held that '[t]he surrounding circumstances as well as any
> express agreement between the parties may evidence the intention of the parties
> necessary to establish such a [partnership] relationship. The right to manage and
> control a business is one circumstance to be considered in determining the existence
> of a partnership relationship. It is especially difficult to determine if a partnership
> relationship exists where, as here, there is no written agreement. The courts, both at
> common law and under the Uniform [Partnership] Act, have recognized that no one
> fact or circumstance can be taken as a conclusive test, nor is it possible to state any
> number of facts that would in all cases be decisive of the existence of a partnership
> relation. In the last analysis there is no arbitrary test for determining the existence of
> a partnership, and each case must be decided according to its own peculiar facts.

That being said, "division of profits, and liability for losses are essential elements of a partnership"

under Alabama law. *See e.g.* Odess v. Taylor, 211 So.2d 805, 811 (Ala. 1968). Here, there was no

agreement to share in the profits or losses of the enterprise; plaintiffs had no ownership interest in

any of the property or stock of Southland; plaintiffs' income was not tied in any way to the net

income of Southland; and both plaintiffs reported their income to the IRS using W-2 forms (forms

used to report *employee* wages), rather than Schedule K-1s (forms used for reporting a *partner's*

share of the partnership's income). This is in spite of the fact Mr. Halter submitted to the IRS in

2003 and 2004 (the years he was employed by Southland) a form 1040, supplemented with a

Schedule E form (which is used to report partnership income) for a partnership venture he and his

wife had created. Moreover, in this matter the *employment* letter from Mr. Painter to plaintiffs

makes no mention of any partnership agreement, but instead refers to plaintiffs' *employment* with

Southland.  Thus, no document or writing has been presented to support plaintiffs' argument on the point and all evidence of the contract is to the contrary.  Under these circumstances, the Court cannot find there exists an issue of material fact, such that plaintiffs' allegation of the existence of an oral partnership agreement should be presented to a jury.

Rather, the Court finds the parties entered into a contract of *employment*, as evidenced by the following documents: (1) the letters from Mr. Painter to plaintiffs, (2) the "Commission Contract" governing the parties' obligations if and when plaintiffs directly sold a policy of insurance to a Southland customer (and a necessary document for plaintiffs to receive override commissions), (3) an application to enter into the health insurance contract between plaintiffs' employer and Blue Cross Blue Shield, and (4) an enrollment form allowing plaintiffs to  have life and disability insurance coverage through their employer's group policy.[23]  The Court further finds the following elements

---

[23] The Court is aware of no general prohibition against parties entering into multiple writings or contracts, and merely because a commission contract was entered into by and between the parties in this matter does not mean, as plaintiffs argue, it was the only controlling contract to the exclusion of the letter agreement (but, rather inconsistently, to the inclusion of the oral "partnership" contract). *See*, 11 RICHARD A. LORD, WILLISTON ON CONTRACTS § 33:24 (4th ed.) ("The mere fact that an oral agreement is contemporaneous with a written one does not necessarily involve the conclusion that they are part of the same contract, and the fact that parties have a written contract on a subject does not prevent them from entering into other agreements relating to the same general subject matter.")  Plaintiff counsel's argument is further weakened by the fact plaintiffs admit they never personally sold or intended to sell any Southland policies.

Additionally, while it is seemingly inconsistent to have two writings – one which refers to plaintiffs as "independent contractors," and another which refers to plaintiffs as "employees" – the Court notes that there is no legal prohibition for having differing contracts and/or agreements govern, depending upon which role or task was being addressed, and it could be that plaintiffs were deemed independent contractors in their capacity as insurance agents for Southland, yet were considered employees in their capacity as Regional Managers.  However, the Court finds it unnecessary to resolve that issue at this juncture, as the exact status of plaintiffs' relationship with defendant, i.e., independent contractors or employees, is not relevant to the ultimate issue – whether there was an agreement between plaintiffs and defendant, whereby "for as long as the agents [recruited by plaintiffs] continued to sell a Southland policy, then Southland would pay Mr. Halter and Mr. Fietz the agreed upon share (i.e., override commissions)" even after termination of plaintiffs' and defendant's business relationship (whatever nature that might have been).  Finally, all testimony indicates - with no evidence presented to the contrary - that the Commission Contracts were not intended to govern the parties' relationship, but

of a valid contract exist: an <u>offer</u> to employ plaintiffs as Regional Managers, with a base salary of

$36,000 per year, override commissions on business generated in their regions, employee benefits,

expense reimbursements and a monthly business development allowance; <u>acceptance</u> of the offer by

plaintiffs [24]; good and valid <u>consideration</u>, as Southland promised employment and a salary in

exchange for plaintiff's working as Regional Managers for Southland[25]; and <u>mutual assent</u> to the

terms of the contract, i.e. all parties understood and accepted all essential terms of the contract,

including the term "override commissions."[26]

---

were executed so that plaintiffs could legally collect override commissions.

[24] Evidence of plaintiffs' acceptance is found in Mr. Painter's letter by use of the phrase, "As per our agreement, your base salary is... ." Furthermore, even if plaintiffs' acceptance were not sufficiently evidenced by the letters, and/or if the letters were merely "proposals" which had yet to be accepted by plaintiffs (as plaintiffs implicitly argue), the proposals (a.k.a. "offers") were accepted by the conduct of plaintiffs when they executed the documents attached to the letter and began working with Southland. *See e.g.*, <u>Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Kilgore</u>, 751 So.2d 8, 11 (Ala. 1999) ("Conduct of one party to a contract from which the other may reasonably draw an inference of assent to an agreement is effective as acceptance.")

[25] *See e.g.*, <u>Ex parte Grant</u>, 711 So.2d 464, 465 (Ala. 1997) ("A test of good consideration for a contract is whether the promisee at the instance of the promisor has done, forborne or undertaken to do anything real, or whether he has suffered any detriment, or whether in return for the promise he has done something he was not bound to do, or has promised to do some act or to abstain from doing something.")

[26] In <u>Lilley v. Gonzales</u>, 417 So.2d 161 (Ala.1982), the Alabama Supreme Court addressed the requirement of "mutual assent to the terms of the agreement," comparing it to the concept of "meeting of the minds." (According to one commentator, the concept of "meeting of the minds" lost judicial favor in the mid-nineteenth century for the more objective concept of "mutual assent." Richard L. Barnes, <u>Rediscovering Subjectivity in Contracts: Adhesion and Unconscionability</u>, 66 LA. L. REV. 123 (2005)) The <u>Lilley</u> court stated:

> Gonzales's argument is premised upon a misconception of the time-honored phrase 'meeting of the minds.' It is true that there is no contract unless the parties assent to the same thing and in the same sense. *But if one seeks to convey his meaning by expressions importing something different, or attaches to the proposition of the other a significance not authorized, whatever injury may result from the misunderstanding must be visited upon him.* Stated another way, *the law of contracts is premised upon an objective rather than a subjective manifestation of intent approach.*

> Professor Corbin, in his treatise on contract law, speaks to the issue of mutual assent as follows:

Although the phrase "override commissions on business generated in your region" is not

defined in the letter from Mr. Painter, under Alabama law, when a contract provides no definition

for a word or phrase ". . . the Court should simply give the undefined word or phrase the same

meaning that a person of ordinary intelligence would give it." Twin City at 692. In this matter, those

within the relevant industry, including plaintiffs, would not, as the accepted understanding, give the

term the meaning argued by plaintiffs. All parties testified they were not aware of any other contract

in the industry whereby an insurance company would provide override commissions to its employees

---

'Agreement consists of mutual expressions; it does not consist of harmonious
intentions or states of mind.... At present, however, what we observe for judicial purposes
is the conduct of the parties. We observe this conduct and we describe it as the expression
of a state of mind. It is by the conduct of two parties, by their bodily manifestations, that we
must determine the existence of what is called agreement. That is what is meant by the
anciently honored term "meeting of the minds." That is what is meant by mutual assent.

'[One] may be "bound" by a contract in ways that he did not intend, foresee, or
understand. The juristic effect (the resulting legal relations) of a man's expressions in word
or act may be very different from what he supposed it would be.... [B]ut it is of much greater
importance to realize that the courts must determine the requirements of justice and that the
legal effects thus given to expressions of agreement are seldom exactly what one or both of
the agreeing parties supposed or expected.' A. Corbin, Corbin on Contracts § 9 (1952).

It is axiomatic that if a contract is ambiguous the court will construe it most strongly
against the party who drew it.

*Where a contract is unambiguous and plain in expression, we know of no canon of
construction that warrants an interpretation the only effect of which is to relieve a party to
the contract from consequences deemed by him hard or unfair.* Where the parties express
without ambiguity their intention, no court can alter the agreement, and no room for judicial
construction is left.

Id. at 163 (citations omitted) (emphasis added). *See also*, Alabama Pattern Jury Instructions Civil,
"Mutual assent means that all parties to the contract understood and accepted all the essential terms of
the contract. Mutual assent is sometimes referred to as a meeting of the minds." APJI 10A.05 (2nd ed.
2006).

on *new* business written *after those employees were no longer employed by the company.*[27]   No

---

[27] Mr. Halter testified at pp. 83-84 of his deposition as follows:

Q. In the insurance – in your industry, is it a standard arrangement for someone to receive commissions for policies written by agents indefinitely?
A. No.
Q. So what Mr. – what you're saying Mr. Painter was proposing with you was unusual?
A. (Affirmative nod.)
Q. Correct?
A. It – not – not the normal, yes.
Q. Do you know of anyone in your industry, other than you and Mr. Fietz, who has such a deal?
A. That's not something that I go around asking, you know.  I don't know that anybody at Southland knew that I was getting more commission than was written anywhere.
Q. I'm going to go back to my question.  My question is: Do you know of anyone in your industry who has the deal that you're claiming that you and Mr. Fietz had, that you would receive commissions indefinitely on any agent you brought to the company?
A. No, I don't know anybody personally.
Q. Did anyone else other than you and Mr. Fietz at Southland, have that arrangement?
A. No.
Q. Did Mr. Lambert have that arrangement?
A. No.

Mr. Fietz testified at pp. 75-76:

Q. . . . Mr. Halter testified yesterday that he did not know of any other contract in your industry for – that provided for a commission for sales after somebody left the company. Do you know of any other people in your industry who have such a provision where they work?
A. Well, you started with a statement and finished with a question.  Can you repeat it? Kyle admitted yesterday –
Q. Mr. Kyle testified yesterday –
A. Testified yesterday, okay.
Q. – that he did not know –
A. Excuse me.
Q. – of any other people in your situation, in the pre-need industry, who have in their employment or working relationship with an insurance company an agreement that they will be paid commissions on business written after they leave the company.  Do you know of anybody else in your industry with such an agreement?
A. I agree with Mr. Halter's statement yesterday.
Q. You don't know of anybody else?
A. I don't know of anybody else.  I'd agree with Halter's statement yesterday.

Mr. Painter testified at p.49:

Q. The standard procedure would be that a – if a regional manager was terminated or left the company, the regional manager would not continue to receive commissions on

testimony or other evidence has been presented to the Court tending to show that in the insurance industry the term "override commissions" is interpreted such that a party would be entitled to override commissions *even after his or her employment with the company providing those override commissions comes to an end.*  Rather, all evidence of that term's meaning within the relevant industry is to the contrary, i.e., that override commissions do not extend to business written after one has left the employ of the company.

Further support for the interpretation that override commissions were to be discontinued on new business written after plaintiffs' termination, is found in plaintiffs' own deposition testimony, where they reluctantly agreed there were never any specific discussions about what would happen should plaintiffs leave Southland.[28] In addition to plaintiffs' admission they know of no other person

---

business written after the regional manger left; correct?
A. Unless there was renewal commissions available which would have – could have gone on.
Q. But the renewal commissions would be on business written before the regional manager left?
A. Correct.
Q. I'm talking just specifically about business written after the regional manager leaves, is it fair to say that the standard way of doing things in your industry when you were president of Southland is that if a regional manger left, say on January 1, and an agent wrote a policy, a new policy on January 2, the regional manager wouldn't get an override commission on that?
A. That's normally standard.

[28] At page 68 of his deposition, Mr. Fietz testified:

Q. But did Mr. Painter say that if you leave Southland for whatever reason . . . you're going to continue to be paid?

A. Mister, we didn't talk about leaving Southland. Again, earlier at the February 10th meeting; I think it was – I'm not sure of the date – when all of us – let me look back here. When all of us went to – yeah, February 10th.  When all of us jumped a plane and went to Southland and met with Dennis and saw Southland and saw how great they were, nobody talked about when the contract was going to be terminated or leaving. We all talked about staying with Southland until we retired. *Nobody talked about when you're terminated or when you leave.*

-24-

in their industry receiving post-termination overrides, this Court's review of all depositions presented reveals neither Mr. Fietz nor Mr. Halter *ever specifically* asked Mr. Painter or anyone else at Southland if they would receive such overrides *if* their arrangement with Southland came to an end, nor did plaintiffs clarify this admittedly unique interpretation of an otherwise accepted industry term. Given plaintiffs' awareness of the highly unusual nature of such an interpretation, it would seem plaintiffs would have (and certainly should have) clarified the issue in their contract or at the very least asked the pivotal question: "We will receive override commissions on new policies sold by agents we recruited, even if the new policies are sold after we might leave Southland?" However, no evidence of any such clarification of this unique interpretation, written or oral, has been presented. Plaintiffs' sole evidence in support of their argument they were to receive this unique remuneration are statements they claim were made to them by Mr. Painter, to the following effect (recognizing, also, this particular version of Mr. Painter's statement is the version most favorable to plaintiffs' position): "You guys bring your team, you guys bring your people, you guys give us the business, put us in these states, and as long as these agents write business, you will receive an override." [Fietz at 64]   This statement itself, however, is not sufficient to support plaintiffs'

---

See also, p.202 ("...we never discussed termination.)

Mr. Halter testified at p.136:

> Q. All right. Now, with regard to the partnering agreement, is it your testimony that you and Mr. Painter never discussed the terms for terminating that agreement?
> A. That's correct.
> Q. Well, if you --
> A. The closest thing to that was we would retire rich men.

See also Painter at 18-20.

position. Under the circumstances, and equipped with the knowledge of the customary meaning of "override commissions" within the relevant industry (which plaintiffs had gained during their "lengthy" careers in that industry), which is consistent with defendant's position and argument, Mr. Painter's statement is consistent with that interpretation within the industry of how overrides typically operate - that is, plaintiffs would receive override commissions on new business brought to Southland by agents plaintiffs' recruited, as long as those agents wrote Southland policies *and* plaintiffs were "giving Southland the business," i.e., as long as plaintiffs were employed with Southland.   Nowhere (other than in plaintiffs' self-serving testimony) is there evidence of an interpretation of this general statement, other than that which is consistent with the standard industry meaning of an override commission.  Again, as previously noted, plaintiffs' burden "is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." Little at 1075.

Finally, the Court notes, upon receipt of the employment letter from Mr. Painter, Mr. Fietz called Mr. Painter to clarify that "pursuant to their negotiations, his monthly transitional allowance was to be $16,000, instead of the $14,000 figure contained in the letter. Mr. Fietz then handwrote the correct figure, along with the annotation, 'per phone 3/21/04[sic],' and returned the letter to Southland." [Doc. 103, p. 5]  Neither the employment letter, nor any clarification, addressed any definition of an override commission as anything other than that which is commonly understood within the industry. Mr. Fietz made the effort to contact Southland, clarify the amount of transitional allowance the parties had bargained for, correct Mr. Painter's letter and return the letter to Southland, yet he did not take that opportunity to clarify and note that plaintiffs had bargained for and expected not merely the industry's standard override commissions, but a highly unusual, post-termination

override commission arrangement.

After an exhaustive review of the applicable law, and all evidence and argument presented, the Court finds defendant has carried its burden of proof to establish its prima facie case as to the relief requested, and additionally finds plaintiffs have failed to carry their burden to meet defendant's argument and evidence with evidence of their own and show there is a genuine issue of material fact warranting trial. Due to the foregoing, the Court **GRANTS** defendant's motion for summary judgment for plaintiffs' claim of breach of contract.

### V. Promissory Estoppel[29]

Under Alabama law, the doctrine of promissory estoppel is expressed as follows: "A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." Bush v. Bush, 177 So.2d 568, 578 (1964) (quoting Restatement of the Law of Contracts, § 90)). The purpose of the doctrine of promissory estoppel "is to promote equity and justice in an individual case by preventing a party from asserting rights under a general technical rule of law when his own conduct renders the

---

[29] Although in earlier filings plaintiff identified this claim as one for detrimental reliance, the Magistrate Judge concluded in the Ruling on the motions in limine [Doc. 98] that the claim is more appropriately designated as a claim of "promissory estoppel." (The doctrines of promissory estoppel and detrimental reliance are quite similar. "Detrimental reliance" is codified in the Louisiana Civil Code at Article 1967. Though the concept of "promissory estoppel" is not addressed in the Louisiana Civil Code, Louisiana jurisprudence seems to recognize such a doctrine. See e.g., Saul Litvinoff, Louisiana Civil Law Treatise, Law of Obligations, § 16.3(2d Ed. 2007) and notes cited therein. "To prevail on a detrimental reliance claim, Louisiana law does not require proof of a formal, valid, and enforceable contract. However, to recover damages for promissory estoppel, a party must prove the existence of a promise and reasonable reliance on the promise to one's detriment." Alabama on the other hand (from this Court's research) does not appear to recognize a claim of detrimental reliance, though it does recognize promissory estoppel." Additionally, the Magistrate Judge ruled plaintiffs' claim for promissory estoppel is governed by Alabama law. Plaintiffs did not appeal the ruling to this Court, and the delay for filing such an appeal has passed. (See L.R. 7.4.1W.) As such, the parties have addressed this claim under Alabama law, and the Court will apply Alabama law to this claim.

assertion of such rights contrary to equity and good conscience." Ford v. Jackson Square, Ltd., 548 So.2d 1007, 1012 (Ala. 1989). Additionally, "courts have been reluctant to permit the enforcement, by the application of the doctrine of promissory estoppel, of promises made contemporaneously with a completed contract, evidence of which promises comes within the prohibition of the parol evidence rule." Davis v. University of Montevallo, 638 So.2d 754, 758 (Ala. 1994) (citing 28 Am.Jur.2d Estoppel and Waiver § 49 (1996) (noting the same court found promissory estoppel where plaintiffs sold their business and moved to a new area relying on promise they would be given a franchise but were not, but failed to find promissory estoppel in a case where plaintiff sold his farm at a loss and relocated due to a promise of "permanent employment" but was thereafter discharged.)[30]

In this matter, defendant argues plaintiffs should not be permitted to assert a claim for promissory estoppel, as a valid and binding at-will employment contract exists between the parties, and as a valid contract exists, plaintiffs cannot show they justifiably relied on any alleged promise of Mr. Painter for post termination override commissions. [Doc. 103, p. 20] Plaintiffs have not opposed defendant's motion for summary judgment on the claim of promissory estoppel.

The Court finds plaintiff's claim of promissory estoppel fails, but for slightly different reasons than those cited by defendant, namely, no injustice has resulted in this matter due to Southland's "promise." As discussed in Section III, *supra* ("Breach of Contract"), Southland agreed to pay plaintiffs override commissions according to that term's customary usage in the industry -

---

[30] A more recent Alabama case states, "When one seeks to impose liability under the doctrine of promissory estoppel, we look to the facts to determine whether that doctrine can be used to create liability, *once we have determined that no binding contract existed.*" Aldridge v. DaimlerChrysler Corp., 809 So.2d 785, 794 (Ala. 2001). The implication of that statement suggests Alabama courts, in more recent jurisprudence, have become more than merely "reluctant" to allow a claim for promissory estoppel with regard to promises made contemporaneously with a completed contract, but perhaps now preclude application of the doctrine altogether when a contemporaneous contract exists. However, the Court need not determine that issue, as it finds plaintiffs cannot meet their prima facie burden for a claim of promissory estoppel.

i.e. while plaintiffs were employed by Southland.  Southland upheld that agreement.  To be sure, Southland's promise of override commissions during employment did indeed induce plaintiffs to act in a certain manner - that is, it induced plaintiffs to recruit agents for Southland, because, like all of Southland's regional managers, plaintiffs' income increased as the agents they recruited and managed sold more policies.  However, merely because in hindsight plaintiffs wish they had taken a different course of action, that does not now mean that Southland should have "reasonably expected" its promise of override commissions would be interpreted in the manner which plaintiffs argue, and thus become (as plaintiffs' argue) the determining factor for plaintiffs decision to forgo starting their own agency at that time.  Unfortunately, most business and employment opportunities involve a certain amount of risk, particularly in "at-will" employment states such as Alabama, Louisiana and Texas.  However, merely because the arrangement did not unfold as plaintiffs had hoped, does not mean under the applicable law, defendant is now bound to something it did not promise plaintiffs to begin with.  Plaintiffs received what they bargained for - override commissions during employment and renewal override commissions post-employment.  Due to the foregoing, the Motion for Summary Judgment with regard to plaintiffs' claim of promissory estoppel is hereby **GRANTED**.

## VI. Unjust Enrichment [31]

Pursuant to Louisiana law, "[t]here is a general concept of quasi contractual obligations; it is a concept based upon the principle that where there is an unjust enrichment of one at the expense or impoverishment of another, then the value of that enrichment or else, in some cases, the amount

---

[31] The Magistrate Judge ruled Louisiana law applies to plaintiffs' claims for unjust enrichment. [Doc. 98]  Plaintiffs did not appeal the ruling to this Court, and the delay for filing such an appeal has passed.  (See L.R. 7.4.1W.)  As such, the parties have addressed this claim under Louisiana law, and the Court will apply Louisiana law to this claim.

of the impoverishment, must be restituted." Minyard v. Curtis Products, Inc., 205 So.2d 422, 432 (1967) (citing Planiol, Traité Elémentaire De Droit Civil, T. 2, n0 812, n0 813 (8th ed. 1939)).[32] The concept is codified at Louisiana Civil Code Article 2298, entitled "Enrichment Without Cause; Compensation," which provides in pertinent part:

> A person who has been enriched without cause at the expense of another person is bound to compensate that person. The term "without cause" is used in this context to exclude cases in which the enrichment results from a valid juridical act or the law. The remedy declared here is subsidiary and shall not be available if the law provides another remedy for the impoverishment or declares a contrary rule.

The requirements of a claim for unjust enrichment are the following: (1) there must be an enrichment, (2) there must be an impoverishment, (3) there must be a connection between the enrichment and resulting impoverishment, (4) there must be an absence of "justification" or "cause" for the enrichment and impoverishment, and (5) there must be no other remedy at law available to plaintiff. Baker v. Maclay Properties Co., 648 So.2d 888, 897 (La. 1995).

As the Court has found a valid contract exists between the parties, plaintiffs cannot maintain a cause of action premised upon unjust enrichment. *See e.g.*, Willis v. Melville, 19 La.Ann. 13 (S.Ct. La. 1867) (party cannot recover for unjust enrichment where a valid contract exists). Accordingly, defendant's Motion for Summary Judgment as to plaintiffs' claim for unjust enrichment is **GRANTED**.

---

[32] *See also*, Scott v. Wesley, 589 So.2d 26, 27 (La.App. 1 Cir. 1991). ("The root principle of an unjustified enrichment . . . is that the plaintiff suffers an economic detriment for which he should not be responsible, while the defendant receives an economic benefit for which he has not paid.") (citing Tate, *The Louisiana Action for Unjustified Enrichment: A Study in Judicial Process*, 51 Tul.L.Rev. 446, 459 (1977)).

## VII. **Defamation** [33]

Plaintiffs maintain that Southland, through two of its employees (Ned Abernathy and David Berringer), made defamatory remarks about plaintiffs to funeral home directors in Texas.  The alleged defamatory statements of which plaintiffs complain are the following: (1) Mr. Fietz "tells his agents writing with him that Unity is rated a B, B+ Company with the A.M. Best Company when in fact they are not" [Aff. of Moore]; (2) Mr. Fietz "sold policies that were no good," and  "his production was too low" [Aff. of Harkey]; and (3) Mr. Berringer stated "Southland was losing money in this area . . . [due to] expenditures by Truett Fietz," made "a small character assassination" on Mr. Fietz and then said things about Mr. Fietz that the agent considered to be "untrue, deragatory [sic], and demeaning." [Aff. of Dowell][34][35]  Plaintiffs assert the defamatory statements about Mr. Fietz were made in order to injure Mr. Fietz and Mr. Halter in their occupation, and in order to unfairly compete with APSI.

Texas law defines defamation as statements which tend to injure a person's reputation and thereby expose the person to public hatred, contempt, ridicule or financial injury, or statements made

---

[33] The Magistrate Judge determined Texas law is applicable to plaintiffs' claim for defamation. [Doc. 98]  Plaintiffs did not appeal the ruling to this Court, and the delay for filing such an appeal has passed.  (See L.R. 7.4.1W.)  As such, the parties have addressed this claim under Texas law, and the Court will apply Texas law to this claim.

[34] Mr. Abernathy denies making certain statements but admits to making others.  No testimony of Mr. Berringer has been presented to the Court.

[35] Additionally, plaintiffs complain Mr. Abernathy made the following defamatory statement to Dean Boyer, a funeral home owner operating in Seminal, Texas:  "Mr. Fietz really did not know what he was doing as far as pre-need sales were concerned," "the pre-need business in the West Texas area had been 'falling off' since it had been under Mr. Fietz's reign," and that Mr. Abernathy "was there - to fix what Truett [Fietz] had screwed up to keep our business" [Aff. of Boyer].  Defendant objects to Mr. Boyer's affidavit because Mr. Boyer was not listed on plaintiffs' initial disclosures, he was not mentioned in plaintiffs' discovery responses or any deposition, and the affidavit is dated two months after the deadline for completion of discovery.  [See Docs. 61, 125]  Plaintiffs have provided no explanation for the delinquent filing.  Therefore, defendant's objection is **GRANTED**.

to impeach a person's honesty, integrity, virtue or reputation. TEX. CIV. PRAC. & REM.CODE ANN.

§ 73.001 (Vernon 2007).[36] As delineated by the Texas Supreme Court:

> To maintain a defamation cause of action, the plaintiff must prove that the defendant: (1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting with either actual malice, if the plaintiff was a public official or public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the statement. . . .
>
> Fault is a constitutional prerequisite for defamation liability. Private plaintiffs must prove that the defendant was at least negligent.

WFAA-TV, Inc. v. McLemore, 978 S.W.2d 568, 571 (Tex.1998) (citations omitted).

As noted by an earlier Texas decision:

> [T]he initial question for determination is a question of law to be decided by the trial court: were the words used reasonably capable of a defamatory meaning. The court construes the statement as a whole in light of surrounding circumstances based upon how a person of ordinary intelligence would perceive the entire statement. Only when the court determines the language is ambiguous or of doubtful import should the jury then determine the statement's meaning and the effect the statement's publication has on an ordinary reader. The threshold question then, which is a question of law, is whether . . . [defendant's] statements are reasonably capable of a defamatory meaning.

Musser v. Smith Protective Services, Inc., 723 S.W.2d 653, 654-55 (Tex. 1987).

Additionally, the United States Fifth Circuit has noted Texas appellate courts recognize two types of defamation: defamation *per quod* and defamation *per se*. Plumley v. Landmark Chevrolet, Inc., 122 F.3d 308, 310 (5th Cir. 1997); *see also*, Bingham v. Southwestern Bell Yellow Pages, Inc., 2007 WL 2744890 (Tex.App.), Southwestern Bell Yellow Pages, Inc. v. Thomas 2006 WL 217665 (Tex. App.). Statements are defamatory *per se* when they are "so obviously hurtful to the person

---

[36] Defamation in written or graphic form constitutes "libel," whereas oral defamation constitutes "slander." TEX. CIV. PRAC. & REM.CODE ANN. § 73.001 (Vernon 2007); Randall's Food Mkts., Inc. v. Johnson, 891 S.W.2d 640, 646 (Tex. 1995). As the alleged defamatory communications in this matter were oral, plaintiff is asserting an action for slander.

aggrieved that they require no proof of their injurious character to make them actionable." Defamation is actionable *per se* if it injures a person in his office, business, profession, or occupation.[37] Knox v. Taylor, 992 S.W.2d 40, 50 (Tex.App.-Hous., 1999) (memorandum sent anonymously by plaintiff's competitor, which compared relationship that led to financial ruin of a third party company to relationship between plaintiff company and its client, was libelous *per se*, being injurious to owner's business and reputation). Damages are presumed in cases of defamation *per se*, and no showing of fault on the defendant's part is required before imposing damages. Snead v. Redland Aggregates Ltd., 998 F.2d 1325, 1331, 1334 (5th Cir.1993).[38] Defamation *per quod* on the other hand, consists of statements that are not inherently slanderous. Moore v. Waldrop, 166 S.W.3d 380, 384 (Tex.App.-Waco 2005). Such statements are actionable "only upon allegation and proof of special damage." Shearson Lehman Huton, Inc. v. Tucker, 806 S.W.2d, 914, 921 (Tex. App. 1991); *see also,* Time, Inc. v. Firestone, 424 U.S. 448, 459 (1976).

> However, Texas recognizes a qualified privilege against a claim of defamation:
>
> A qualified privilege protects statements made in good faith on a subject matter in which the author has an interest with reference to which he has a duty to perform to another person having a corresponding interest or duty. In order to overcome the defense of privilege and impose liability for liable and slander, . . . [plaintiff] must prove that . . . [defendant] acted with malice. The falsity of a statement is insufficient to prove malice.

Halbert v. City of Sherman, 33 F.3d 526, 530 (5th Cir.1994) (citations omitted). Malice exists where the statement "is made with knowledge of its falsity or with reckless disregard as to its truth." Saudi

---

[37] Additionally, words that "impute the commission of a crime . . . or impute unchastity to a woman" constitute slander *per se*. Plumley at 310.

[38] "Because damage to a person's reputation is difficult to quantify, the law allows the factfinder to presume damages to compensate for that damage. Even if the factfinder finds that the plaintiff's reputation was damaged, however, it may choose not to award presumed damages." Snead at 1334.

v. Briven, 176 S.W.3d 108, 118 (Tex.App. 2004).  "An uncontroverted affidavit by the person publishing the statement that indicates the statement was not made with actual malice is sufficient to meet the burden to negate actual malice as a matter of law."  Assoc. Press v. Cook, 17 S.W.3d 447, 458 (Tex.App. 2000).

As an initial matter, defendant argues plaintiffs cannot carry their prima facie burden with respect to their claims of defamation on behalf of Mr. Halter or APSI, because none of the alleged statements concern either Mr. Halter or APSI.  Regarding Mr. Halter's claim, Southland points out plaintiffs' only support is hearsay, found in Mr. Halter's deposition, wherein Mr. Halter testified Southland employees told Mr. Halter's business associate, Mack Cruise, "those guys [Halter and Fietz] didn't know what they were doing, their persistency was bad, and they were spending too much money." [Doc. 135, p. 27] As defendant notes, it is improper for the district court to consider hearsay evidence in affidavits, or in depositions in support of or in opposition to a motion for summary judgment.  Martin v. John W. Stone Oil Distributor, Inc., 819 F.2d 547, 549 (5th Cir. 1987).[39]  Defendant has carried its burden as movant and plaintiff has failed to submit competent summary judgment evidence in support of Mr. Halter's defamation claim to meet defendant's evidence and argument, and therefore, defendant's Motion for Summary Judgment is **GRANTED** with respect to Mr. Halter's claim of defamation.

Regarding APSI, defendant points out plaintiffs have not identified any defamatory statements concerning APSI.  To overcome this hurdle, plaintiffs argue:

Mr. Halter explained that APSI receives an override commission off of the

---

[39] *See also,* Lujan at 889 ("Rather, the purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues.")

production of Truett Fietz.   After Mr. Fietz establishes that Southland made statements about him which are defamation per se, then his actual damages are presumed.   Snead, 1331-32.   Because APSI earns a certain fixed percentage of override commission off of the production of Mr. Fietz, its profit is a function of Mr. Fietz's production.  If Mr. Fietz's actual damages are presumed, then the damages of APSI should also be presumed as APSI was also harmed by the defamation of its marketing agent, Mr. Fietz.   No independent proof of damage is required if defamation per se is established.  Knox at p. 60.

[Doc. 135, pp. 26-27, footnotes omitted][40]  As defendant notes, essentially plaintiff is claiming APSI suffered some sort of derivative harm due to the defamation of Mr. Fietz.[41]  The Court finds Southland has carried its burden and pointed to the absence of evidence supporting APSI's claim for defamation, namely, no defamatory statements were made about APSI and plaintiffs have not met that evidence and argument.  As such, Southland's motion for summary judgment with respect to APSI's claim of defamation is **GRANTED**.

Turning our attention to Mr. Fietz, as instructed by the Texas courts, this Court's threshold inquiry is whether the remarks made by Southland employees about Mr. Fietz are "reasonably capable of a defamatory meaning . . . based upon how a person of ordinary intelligence would

---

[40] The Court notes Knox, at the page plaintiff counsel cites, merely states: "In the recovery on a claim of defamation per se, the law presumes actual damages and no independent proof of damages to reputation or of mental anguish is required."  Whether the case actually stands for the proposition plaintiff counsel argues - that when a person's business reputation is defamed *per se* such that his damages are presumed, his employer is also entitled to presumed damages - is not clear to the court.  Though the Knox court did uphold a damage award to plaintiff's company (plaintiff was the president and owner of the company), plaintiff had brought claims for both defamation and tortious interference with a contract, and was successful on both claims.  The damages section of the appellate court's ruling does not separate the damages awarded for each claim.  Thus, Knox is insufficient authority to show APSI has a right of action due to defamatory remarks made about its employee.

[41] Additionally, defendant argues although plaintiff has correctly stated that under Texas law, a corporation can be defamed, in this matter no statements were made about APSI.  The cases cited by plaintiff involved defamatory statements made about the corporation itself.  Again, plaintiffs have cited no authority for their position that an employee has a right of action against the tortfeasor of its employee, even where the injury to the employee allegedly causes the employer to lose productivity. [Doc. 147, p. 4]

perceive the entire statement." <u>Musser</u> at 654.  The statements at issue were made following Southland's termination of Mr. Fietz, and after Mr. Fietz began working for APSI (Southland's competitor).  Under these circumstances, the statements noted above could expose Mr. Fietz to financial injury, as the statements could potentially impeach Mr. Fietz's honesty, integrity, virtue and/or reputation.  Thus, the Court finds the words were reasonably capable of a defamatory meaning.

However, defendant argues plaintiffs' claims should fail for the following reasons:  First, the alleged statements are "opinions" protected by the First Amendment.  Second, presuming the statements are defamatory, they are not inherently defamatory, and therefore constitute defamation *per quod*.  Because Mr. Fietz cannot prove he suffered special damages from the statements, he cannot meet his prima facie burden for a claim of defamation *per quod*.  Third, any statements made were substantially true, and therefore do not give rise to a claim for defamation.  Fourth, the statements are subject to the qualified privilege provided under Texas law, because they were made "by an employer regarding its employees" to a person having an interest in the matter to which the communication relates.  Finally, in the alternative, defendant argues plaintiffs only should be allowed to recover for any general damages incurred - no recovery should be permitted for special damages.

## A.     <u>First Amendment</u>

Defendant argues any statements made by its employees were merely statements of opinion (rather than statements of fact), and therefore, those statements are protected by the First Amendment.  The Court notes in <u>Milkovich v. Lorain Journal Co.</u>, 497 U.S. 1, 18, 22 (1990), the Supreme Court addressed this argument, noting the lower courts that had mandated an inquiry into whether a statement constituted "opinion" or "fact" had done so due to a mistaken reliance on dictum

contained in <u>Gertz v. Robert Welch, Inc.</u>, 418 U.S. 323, 342 (1974).  The Supreme Court further noted the First Amendment provides adequate protections to freedom of expression "without the creation of an artificial dichotomy between 'opinion' and fact." <u>Milkovich</u> at 19.

The United States Fifth Circuit has instructed trial courts, when examining claims of defamation, to first determine whether the defamatory statements concern a public or private figure, and whether the relevant speech involved a matter of public or private concern. <u>Snead v. Redland Aggregates, Ltd.</u>, 998 F.2d 1325, 1328, 1330 (5th Cir. 1993).  ("The status of the liable plaintiff and the alleged libelous speech determine the minimum constitutionally-required standard of fault.")  No argument has been made that Mr. Fietz is a public figure (in fact, neither party has addressed this inquiry), and the Court finds he is not. *See e.g.*, <u>Gertz</u> at 342 (1974) ("Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention . . . and those who hold governmental office . . . " are properly classified as public figures.)

As to whether the speech involves a matter of public or private concern (neither party has addressed this inquiry), the Court finds it involves a purely private concern. *See* <u>Connick v. Myers</u>, 461 U.S. 138, 145 (1983) (public speech is speech relating to any matter of political, social, or other concern to the community).  In this matter, the defamatory statements allegedly were made by two employees of Southland, Mssrs. Abernathy and Berringer, to individual funeral home owners, when those employees were attempting to retain various agents on behalf of Southland (and presumably to increase their own override commissions).  None of the statements address "any matter of political, social or other concern to the community." <u>Connick</u> at 145; *see also* <u>Snead</u> at 1330 (press release accusing two corporations of "international theft," "industrial espionage," and "international piracy," while perhaps addressing an issue of which the public is concerned, did "not concern an

ongoing public debate about international competition in industrial espionage," nor did the press release attempt to enlighten the general public, and therefore, the speech was "solely in the individual interest of the speaker and its specific business audience.") Under such circumstances, the Court concludes the speech was of private concern, and thus entitled to less protection under the First Amendment than speech of public concern. Consequently, the State of Texas' interest in compensating Mr. Fietz for injury to his reputation by way of a claim for defamation outweighs any First Amendment interest in protecting the particular speech at issue. *See* Dun & Bradstreet v. Greenmoss Builders, Inc., 472 U.S. 749 (1985) (false credit report issued to construction contractor's creditors, which was clearly damaging to contractor's business reputation, did not involve matters of public concern, as contractor's credit report concerned no public issue, but rather was solely in the individual interest of the speaker and its specific business audience; additionally noting, "speech on matters of purely private concern is of less First Amendment concern" than speech on public issues, which "occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection.")

**B.    Defamation *per se* versus defamation *per quod***

Again, defendant argues the statements constitute defamation *per quod* (rather than defamation *per se*), and thus require a showing of special damages, which plaintiff cannot do. As previously noted, statements are slanderous *per se* if they expose the person to public hatred, contempt, ridicule or financial injury, or if they are made to impeach a person's honesty, integrity, virtue or reputation. Statements which injure a person in his office, business, profession, or occupation constitute defamation *per se*. Here, statements made by Southland employees could be found to disparage Mr. Fietz's professional reputation, thus causing injury to his business or

-38-

professional occupation.  Taking plaintiff's allegations as true, Southland employees stated, "Mr.

Fietz really did not know what he was doing as far as pre-need sales were concerned," "the pre-need

business in the west Texas area had been 'falling off' since it had been under Mr. Fietz's reign,"

Southland employees needed "to fix what Truett [Fietz] had screwed up" to keep Southland's

business, Mr. Fietz provided agents with misleading information about the quality of insurance APSI

was selling, etc.  The Court finds these statements are reasonably capable of defamatory meaning,

and, if such statements were made, they would constitute defamation *per se*, as they could potentially

harm Mr. Fietz's business reputation.  As the Court finds the statements constitute defamation *per

se*, damages are presumed.  <u>Snead</u> at 1331.  Thus, plaintiffs are not required to prove they suffered

special damages from the statements, as defendants argue.[42]

## C.      The statements were substantially true

In this section of their brief, defendant argues the alleged statements were substantially true

and therefore do not give rise to a claim of defamation.  Defendant, citing the affidavit of

Southland's president, Robert Jennings, argues Mr. Fietz was indeed terminated because of poor

persistency figures, a high rate of NSF checks, lapsed policies, debit balances for agents in his

territory, and reliance on direct advertising, which was inconsistent with the direction preferred by

Southland's board of directors.  Defendant also argues it was losing money and incurred a net loss

---

[42] While the Court recognizes "presumed damages are available in cases of liable *per se*," the justification for presumed damages is due to the fact that "damage to a person's reputation is difficult to quantify."  <u>Snead</u> at 1331.  However, "even if the fact finder finds that the plaintiff's reputation was damaged, . . . it may choose not to award presumed damages."  <u>Id</u>.  From what has been presented to the Court thus far, it does not appear Mr. Fietz suffered any damage to his reputation.  All of the affidavits submitted in support of plaintiff's defamation claim show the funeral home directors/agents were incensed by the defamatory comments they state were made to them by Southland employees.  Furthermore, all affiants either explicitly or implicitly state they discontinued their business with Southland and continued doing business with Mr. Fietz.  As such, from what is currently before the Court, it does not appear Mr. Fietz suffered any damages at all from the defamatory comments, however this Court need not make that determination at this juncture.

the year of plaintiffs' termination. [Doc. 103-4, pp. 33-34] "[U]nder Texas law, 'a statement that is substantially true is not defamatory.'" <u>Wehling v. Columbia Broadcasting Systems</u>, 721 F.2d 506, 509 (5th Cir. 1983) (citing <u>Brueggemeyer v. Associated Press</u>, 609 F.2d 825, 826 (5th Cir. 1980)). Of course plaintiffs vehemently disagree. Whether the statements made by Southland's employees were substantially true is a factual issue, involving credibility determinations, and that issue is more appropriately decided by a jury than this Court.

**D.   <u>Employer/employee qualified privilege</u>**

Defendant argues even if the statements are false,

[T]he statements are subject to a qualified privilege under Texas law because they were made by an employer regarding its employees. Under Texas law, a disparaging remark about an employee by his employer, made to a person having an interest or duty in the matter to which the communication relates, has a qualified privilege. . .

The qualified privilege is applicable in this case because the Plaintiffs were former employees of Southland. Moreover, both Mr. Dowell and Mr. Harkey had an interest in the reasons why Mr. Fietz was terminated: they were former agents of his territory and asked why he was no longer their regional manager. Therefore, the alleged statements are subject to the qualified privilege that requires a showing of actual malice."

[Doc. 135-4, p.35]

First, the Court notes that the qualified privilege provided by Texas law is not constricted to statements made by an employer about its employees. Rather, the qualified privilege "protects statements made in good faith on a subject matter in which the author has an interest" or statements made by a person owing a duty to another person of corresponding interest or duty. <u>Halbert</u> at 530; *see also* <u>WFAA-TV, Inc. v. McLemore</u>, 978 S.W.2d 568 (Tex. 1998). However, in order to succeed on summary judgment, Southland bears the burden of proof for this defense and "must conclusively establish that the allegedly defamatory statement was made with an absence of malice." <u>Randall's</u>

Food Mkts, Inc. v. Johnson, 891 S.W.2d 640, 646 (Tex. 1995); WFAA-TV at 574.

To negate actual malice, Southland has presented the affidavits of Ned Abernathy and Robert Jennings. Mr. Abernathy denies making certain statements and admits making others. As to those statements which Mr. Abernathy admits he made, Mr. Abernathy explains in his affidavit why he believes those statements are true. Mr. Jennings, on the other hand, denies any knowledge of any disparaging comments, but basically explains why those statements would be true, if indeed they were made. There is no testimony in the record from Mr. Berringer.[43] To controvert defendant's specific assertions, plaintiffs insist the statements made about Mr. Fietz are false and were made to unfairly compete with Southland. Plaintiffs also point out contradictions between Mr. Jennings and Mr. Abernathy's affidavits. As contradictory evidence and argument has been presented on the issues of "truth" and "malice" (and as defendant has put forth no evidence at all with regard to Mr. Berringer), the Court finds these determinations are more appropriately decided by a jury rather than the Court. While the Court recognized the difficulty a defendant faces on summary judgment by requiring he prove a negative (i.e. the absence of malice), nevertheless, from this Court's review of the cases cited as well as the cases reviewed during the course of the Court's independent research, it appears the law of the State of Texas would. Due to the foregoing, the defendant's motion for summary judgment as to the claim of defamation asserted on behalf of Mr. Fietz is **DENIED**.[44]

---

[43] Despite the fact it is Southland's burden to show it acted with a lack of malice, it has not submitted an affidavit of Mr. Berringer, but merely notes plaintiffs did not take the deposition of Mr. Berringer, "who is an out-of-state witness and cannot be compelled to appear at trial." [Doc. 103, p. 36]

[44] As noted earlier, defendant also argues, "Even if the qualified privilege is not applicable, the Court should limit plaintiffs' remedy to general damages." Defendant reasons that if plaintiffs are able to "convince the Court that any of the three alleged sets of statements constitute defamation *per se*, they are entitled to a presumption of general damages," but plaintiffs are "not entitled to recover special damages . . . unless they present proof of actual injury suffered as a result of those particular statements." Because "plaintiffs admittedly suffered no special damages whatsoever from the three sets of alleged statements," plaintiffs should be limited to recovery of general damages. [Doc. 103-4, pp. 37-38] Defendant's sole

## VIII. **Conclusion**

For the foregoing reasons, defendant's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART.** The motion is granted with regard to: (1) plaintiffs' claim of breach of contract; (2) plaintiffs' claim of promissory estoppel; (3) plaintiffs' claim for unjust enrichment; (4) Mr. Halter's claim of defamation; and (5) APSI's claim of defamation. Defendant's motion for summary judgment as to Mr. Fietz's claim of defamation is **DENIED.**

Signed this the _____ day of _____, 2007.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE

12-10-07
c2
via fax : Brown III
Phipps
Pinkerton
Terk
Waldron

---

support for this argument is one partial quotation contained in the corporate deposition of APSI, wherein Mr. Halter stated, "it is evident these guys didn't believe these statements . . . because they are still doing business with us." However, plaintiffs have submitted expert reports detailing the special damages they have incurred. The Court finds defendant has failed to carry its burden *on summary judgment and as a matter of law* that plaintiffs should be limited to recovery only of general damages.